Rose CAMMER, et al., Plaintiffs,

v.

Bruce M. BLOOM, et al., Defendants.

Civ. A. No. 88–2458.

United States District Court, D. New Jersey.

April 19, 1989.

Peter S. Pearlman, Cohn & Lifland, Saddle Brook, N.J., and David J. Bershad, Milberg, Weiss, Bershad, Specthrie & Lerach, and Stephen T. Rodd, Abbey & Ellis, New York City, for plaintiffs.

Torre, Garman & Amdur, East Rutherford, N.J., for defendant Bruce M. Bloom.

Fischer & Kagan, Clifton, N.J., for Philip I. Kagan.

Clyde A. Szuch, Pitney, Hardin, Kipp & Szuch, Morristown, N.J., and Charles A. Gilman, Cahill, Gordon & Reindel, New York City, for defendant Peat Marwick Main & Co.

James P. Anelli, Kalb, Friedman, Siegelbaum & Moran, Roseland, N.J., and Ronald E. DePetris, Summit, Rovins & Feldesman, New York City, for defendant Michael Weinstein.

Greenberg Margolis, Ziegler, Schwartz, Dratch, Fishman, Franzblau & Falkin, Roseland, N.J., for defendant Richard Bober.

McKenna, Liska & Leone, Red Bank, N.J., for defendant Dennis Lustig.

## OPINION AND ORDER

LECHNER, District Judge.

This is an action brought by holders of common stock of Coated Sales, Inc. ("Coated Sales" or the "Company"). The individual defendants include Bruce M. Bloom, Richard Bober, Ernest Glantz, Michael S. Weinstein, Dennis Lustig, and Philip I. Kagan ("Kagan"). These individuals are or were high level officers of Coated Sales and, in the case of Kagan, an outside director and attorney for the Company. Other defendants include Coated Sales, now in

bankruptcy proceedings, and Peat Marwick Main & Co. ("PMM"), the former independent auditors for Coated Sales. Separate motions have been filed by PMM and Kagan attacking the sufficiency of plaintiffs' Consolidated Amended Class Action Complaint (the "Amended Complaint").[1]

Count I of the Amended Complaint is asserted pursuant to Sections 10(b) and 20(a)[2] of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) (1982) and 78t(a) (1982), and Rule 10b–5 promulgated under Section 10(b). Count II of the Amended Complaint alleges common law fraud and deceit under the law of the State of New Jersey. Count III of the Amended Complaint asserts a claim of negligent misrepresentation, again based upon New Jersey law.

PMM's motion requests a dismissal of Count I pursuant to Fed.R.Civ.P. 12(b)(6) (for failure to allege necessary elements, or adequate substitutes therefor, of the securities fraud claims) and Fed.R.Civ.P. 9(b) (for failure to allege fraud as to PMM reports with particularity). PMM's motion requests a dismissal of Counts II and III on the grounds that, if Count I is dismissed, there will exist no independent basis for federal jurisdiction, and, as well, pursuant to Fed.R.Civ.P. 9(b); 12(b)(1) and 12(b)(6).[3]

---

**1.** Seventeen individual actions were originally filed in this court and one action was filed in the Eastern District of New York. All actions were consolidated by order of the court on July 20, 1988. The Amended Complaint, a product collaborated on by about twenty-nine law firms over three months time, marks the eighteenth complaint in this action. It has enjoyed input from attorneys who are very familiar with the legal issues raised by PMM's motion to dismiss for failure to state a claim. Milberg, Weiss, Bershad, Specthrie & Lerach, counsel for plaintiffs, recently articulated, in an amicus brief to the Supreme Court of the United States in *Basic v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the specific elements which must be pled in order to make out a claim under the fraud-on-the market theory.

**2.** Although PMM has moved to dismiss all aspects of Count I, plaintiffs have stated in their opposition brief that PMM misread the Amended Complaint and that the Section 20(a) claims were only made against the individual defen-

dants. Plaintiffs' First Brief (as defined in footnote 3) at 6, n. 4. Consideration of these motions need not include consideration of the adequacy of the Section 20(a) claims against PMM.

**3.** Because new issues have been raised on a piecemeal basis since the original briefs were filed in connection with PMM's motion, the parties were given ample opportunity to make additional submissions amplifying their positions. The several submissions referred to herein (which is not an inclusive list of the submissions filed in this matter) are identified as follows: Memorandum of Plaintiffs in Opposition to Motions of Defendants PMM and Kagan to Dismiss the Amended Complaint, filed October 11, 1988 ("Plaintiffs' First Brief"); Plaintiffs' Memorandum in Response to the Suggestion of a Jury Trial Limited to the Issue of the Application of the Fraud on the Market Rule, filed December 13, 1988 ("Plaintiffs' Second Brief"); Affidavit of Norman S. Poser, filed December 13, 1988 ("Poser Affidavit"); Plaintiffs' Supplemental Memorandum Concerning the Reliance Presumption

Kagan's motion requests a dismissal of Counts I, II and III pursuant to Fed.R.Civ. P. 12(b) (for failure to allege facts giving rise to controlling person's liability under the federal securities laws) and Fed.R.Civ. P. 9(b) (for failure to allege specific fraud on the part of Kagan).

*Facts* [4]

Coated Sales, incorporated under the laws of the State of New Jersey in 1974, develops and sells specially treated fabrics to industry and government. Coated Sales became a public company in 1984 when it offered shares of common stock registered on Form S–1 under the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77a *et seq.*, the Securities and Exchange Commission ("SEC") form which relatively new and unseasoned corporate issuers are required to use for securities offerings.[5] The Company's publicly held securities are not listed on a national exchange, but instead are traded in the "over-the-counter" market (a reporting network in which transactions in securities are reported to the National Association of Securities Dealers for publication) and listed on the NASDAQ automated national quotation system ("NAS-

DAQ"). According to the Amended Complaint, during the class period[6] Coated Sales had approximately 19,000,000 shares of stock outstanding which were held by approximately 1200 holders. Amended Complaint ¶ 10. The Amended Complaint contains no other factual allegations indicating the degree to which the Company's stock was traded or followed by investors and analysts; it does not allege in plain words or otherwise the market for Coated Sales stock was efficient or well-developed.

As is sometimes the case with new "growth companies," Coated Sales found itself in a bankruptcy situation (Chapter 11 filing made on June 16, 1988) after learning from PMM that the Company's financial well being had been overstated in the last two years. PMM had been the independent public auditor for Coated Sales until it resigned, as announced by the Board of Directors of the Company on May 23, 1988. Although not overly critical to most aspects of the present motions, a short summary of the Company's troubles is useful.

According to the Amended Complaint, Coated Sales had booked material amounts of revenue in fiscal years 1987 and 1988

Under the Fraud on the Market Theory, filed February 2, 1989 ("Plaintiffs' Third Brief"); Plaintiffs' Memorandum Regarding Reliance and Further Submission on the Suggested Bifurcation of the Efficiency Element of the Fraud on the Market Presumption, filed March 10, 1989 ("Plaintiffs' Fourth Brief"); Memorandum of Law in Support of Motion of PMM to Dismiss the Amended Complaint, filed on October 19, 1988 ("PMM's First Brief"); PMM's Submission with Respect to Bifurcation, filed December 14, 1988 ("PMM's Second Brief"); PMM's Supplemental Submission with Respect to Bifurcation, filed February 2, 1989 ("PMM's Third Brief"); PMM's Second Supplemental Submission with Respect to Bifurcation, filed March 10, 1989 ("PMM's Fourth Brief").

PMM's motion to dismiss was argued for the final time on April 14, 1989 (the "Hearing"). Several aspects of PMM's motion were brought further into focus at the Hearing, as indicated below.

4. Because PMM and Kagan have moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6), the facts set forth in the Complaint would ordinarily be taken as true. Additional "facts", however, have come to light by way of affidavits and depositions. As discussed in greater detail below, Rule 56, applicable to mo-

tions for summary judgment, applies to all aspects of PMM's present motion. Kagan's motion, however, will be treated under the Rule 12(b)(6) standard. *See* footnote 16.

5. Form S–1 is the Securities Act form to be used by domestic issuers not eligible to use other forms, such as Form S–2 or Form S–3. Generally speaking, it is the largest and most well known companies which register equity securities on Form S–3. To be eligible to use Form S–3 in connection with an equity offering, an issuer must, among other things, have been filing reports under the Exchange Act for at least thirty-six months and either have outstanding $150 million of voting stock held by nonaffiliates or $100 million of such stock outstanding coupled with an annual trading volume of three million shares per year. SEC Form S–3 Instructions, ¶ 1–B–1.

6. According to the allegations contained in the Amended Complaint, the class consisted of all persons who purchased shares of Coated Sales common stock on the open market, during the period from May 6, 1987 (the date Coated Sales announced its preliminary results for the year ended February 28, 1987) to and including June 14, 1988 (the "Class Period"). Amended Complaint at ¶ 9.

pursuant to fictitious "bill and hold" transactions. Under this procedure, the Company would sometimes recognize revenue in advance of shipping goods to customers, an accounting practice which is allegedly acceptable only where there exists a sound business justification, i.e., the customer has yet to instruct the Company as to where and when to ship the goods.[7] The Amended Complaint indicates this accounting practice was accomplished by the creation of phony invoices which were never sent to the purported customer. The invoices were marked with the instruction "Bill and Hold, Do Not Call". Plaintiffs allege this unusual instruction should have revealed the scheme to falsify revenues.

In addition, the Amended Complaint alleges Company officers perpetrated a significant fraud beginning in the Fall of 1987 in connection with a phony equipment acquisition. These officers stated an equipment manufacturer received $6,000,000 from Coated Sales as a deposit on the machinery; this amount was capitalized and classified on the balance sheet as part of the current assets. It is asserted that on May 6, 1988, PMM learned the $6,000,000 deposit for machinery was a sham transaction and reported this to the Company's Board of Directors at its May 20, 1988 meeting. On May 23, 1988 Coated Sales announced PMM had resigned as the Company's auditors because it was dissatisfied with representations regarding the alleged $6,000,000 payment for machinery in October, 1987 and determined it could not rely on the representations of management.

In response to PMM's resignation, the Board appointed an outside director to investigate the $6,000,000 transaction. As a result of the investigation, Coated Sales conceded on May 31, 1988 that the $6,000,-000 "deposit" on machinery reportedly made in October, 1987 and the $6,000,000 "receipt" by the supposed equipment man-

ufacturer in May 1988 of a deposit never took place. The Company conceded the net assets reported as of November 30, 1987 and May 17, 1988 were overstated by $6,000,000. The Company also conceded that "material irregularities in the booking of accounts receivable were discovered" and stated that "many of the individual defendants were being terminated from their senior management positions." Amended Complaint ¶ 34(a).

On May 31, 1988 a press release was issued concerning the foregoing events. Following the announcement on May 31, 1988 the market price of Coated Sales common stock dropped 2⅛ points per share. During the Class Period, the stock reached a high of $12 per share. Amended Complaint ¶ 35. It is not clear from the Amended Complaint how quickly the 2⅛ point per share drop occurred. Furthermore, while it appears from this allegation that Coated Sales stock declined during the Class Period, it is not possible to determine from the Amended Complaint to what extent various changes in the price occurred in response to specific information released by the Company during the period.

The vast majority of the allegations contained in the Amended Complaint, and indeed all of the allegations relating to the culpable acts referred to above, are made against individual defendants Weinstein, Bober, Bloom, Glantz and Lustig, the top management of Coated Sales. As to PMM, the Amended Complaint alleges Coated Sales' 1987 fiscal year and financial statements were fraudulent and PMM nonetheless issued its unqualified opinion that the financial statements had been audited by PMM in accordance with generally accepted auditing standards ("GAAS") and fairly represented the financial position of Coated Sales under generally accepted ac-

---

**7.** Footnote 1 to the financial statements audited by PMM for the year ended February 28, 1987 sets forth the Company's purported policy with respect to revenue recognition as follows:

The Company recognizes revenue generally when goods are shipped to customers. In some cases, under arrangement with certain customers, upon completion of the manufacturing process the Company will invoice the customer, and recognize the related revenue, but will not ship the goods. The Company will hold the goods on behalf of the customer until the customer instructs the Company as to where and when to ship the goods.
Amended Complaint at ¶ 23.

counting principles ("GAAP").[8]

The Amended Complaint recites in detail what auditing steps should have been taken, and what accounting treatment should have occurred, under GAAS and GAAP and further states how various accounting principles and standards were violated in this case. For example, the Amended Complaint alleges PMM violated GAAP by permitting Coated Sales to book material amounts of revenue in fiscal 1987 from the fictitious "bill and hold" transactions. PMM was allegedly required under GAAS to take greater than usual care in auditing these transactions because GAAP does not allow such revenues to be recorded prior to shipment, absent a compelling business purpose, and because of the unusual legend contained on the invoices: "Do Not Call." In addition, the Amended Complaint alleges PMM delayed unreasonably in bringing the financial irregularities to the attention of the Company's Board of Directors at its regular meeting on May 20, 1988, some two weeks after PMM discovered them.

The financial statements, along with PMM's opinion, were contained in Coated Sales' 1987 Annual Report and 10–K Report.[9] PMM's present motion centers on the issue of reliance which, as discussed below, is a necessary element to a securities fraud lawsuit. It is not clearly alleged in the Amended Complaint, however, any of the plaintiffs directly relied on the annual reports in purchasing their shares of Coated Sales stock. The Amended Complaint is ambiguous on this issue.[10] It appears the issue of individual reliance was never taken seriously by plaintiffs in this litigation until very recently in the latest of several rounds of briefing. Although they appeared to rely primarily on the fraud on the market theory (as a substitute for individual reliance)[11] in their "early round submissions," plaintiffs, responding to a recent suggestion that this issue be promptly investigated, belatedly made testimonial and legal submissions which, at least as to some named plaintiffs, purportedly demonstrate direct and indirect reliance on the PMM 1987 audit report.[12]

8. PMM did not examine and report on any Coated Sales financial statements other than that for fiscal year 1987. While most of the alleged accounting irregularities impact the fiscal year 1988 financial statements, plaintiffs have alleged quite specifically there were material misstatements ($10 million overstatement of revenue) contained in the 1987 audited financials. Amended Complaint ¶ 39.

In addition, although PMM did not certify the 1988 financial statements, plaintiffs allege PMM became aware of accounting irregularities just prior to the release of the preliminary 1988 financial results, and that PMM breached various duties under state law by waiting two weeks before notifying the Coated Sales Board of Directors.

9. Pursuant to Section 15 of the Exchange Act, public companies are required to file periodic reports with the SEC. Such reports remain "on file" and are available to investors for inspection. Companies must file under Section 15(d) an annual report (distinct from the annual report mailed to shareholders), within ninety days of the end of each fiscal year, on SEC Form 10–K.

10. Buried in the Amended Complaint, ¶ 55, a suggestion is made that certain plaintiffs relied on the PMM report. Paragraph 55 states that "[w]ithout knowing of the falsity of the reports and statements described above, plaintiffs and class relied, to their damage, on those reports and statements and/or on the integrity of the

market of Coated Sales stock." Id. Nowhere else in the Amended Complaint do plaintiffs allege actual reliance. While it might be said the Amended Complaint provides the defendants adequate notice of the possibility of reliance, it also appears the plaintiffs may have attempted to "straddle the line" in order to avoid violating Fed.R.Civ.P. 11. If the plaintiffs, at least a meaningful number of them, actually relied on the PMM report, a more explicit allegation to that effect should have been set forth.

11. As discussed in detail below, while reliance continues to be a necessary element to be proved in Rule 10b–5 securities fraud actions, courts have allowed for a presumption of reliance in certain circumstances. As relevant here, courts have permitted a rebuttable presumption of reliance in the case of securities traded in "efficient markets" (i.e., markets which are so active and followed that material information disclosed by a company is expected to be reflected in the stock price). This substitute for actual reliance is commonly referred to as fraud on the market.

12. PMM filed a simultaneous submission which contradicts plaintiffs' characterizations of deposition testimony on the reliance issue and which refutes various arguments articulated by plaintiffs to the effect that indirect reliance on the PMM report (i.e., discussions with third parties who actually read it) is enough to state a securi-

As discussed later, PMM's motion will be treated under Rule 56 and factual assertions contained in the recent submissions will be taken into account.[13] At the Hearing, plaintiffs' counsel summarized the reliance situation in this litigation as follows: some plaintiffs directly relied upon the PMM report; some plaintiffs relied upon the PMM report, but indirectly through the advice of third parties such as brokers or family members who themselves read it; some plaintiffs relied on the "efficiency of the market" to reflect the content of the PMM report and other data released by the Company in the price of the Coated Sales stock; and some plaintiffs assert a combination of the foregoing forms of reliance. It was suggested at the Hearing multiple classes may well be sought to be certified, perhaps with certain stipulations to be entered into between the parties. It was represented by plaintiffs' counsel at the Hearing that there existed a sufficient number of plaintiffs who directly relied upon the PMM report, so that the numerosity prerequisite to such a class certification could be met.

To the extent direct reliance is deemed to have been asserted (by at least some plaintiffs), PMM's motion to dismiss on summary grounds must clearly be denied. The strong impression created in this lawsuit, however, is that, of the several investors who purchased Coated Sales stock during the Class Period, most of them will depend on the availability of the fraud on the market presumption of reliance.[14] If it is avail-

---

ties fraud claim. In short, after significant briefing (and perhaps wasteful delay) on the fraud on the market theory, plaintiffs have now attempted to introduce aspects to this litigation which could alter (indeed, complicate) the complexion of future discovery and the trial.

Plaintiffs' counsel argued at the Hearing that plaintiffs had taken the position from the beginning that many of them could demonstrate direct reliance. At a hearing on November 14, 1988, however, plaintiffs' counsel appeared to concede there did not exist direct reliance. Noting the inquiry into the fraud in the market was "not merely an intellectual exercise," PMM's counsel represented that sworn interrogatories and answers from named plaintiffs revealed the fact that none of them relied upon the PMM report in connection with purchases of Coated Sales stock. (Transcript at p. 3). Mr. Bershad, counsel to plaintiffs, had ample opportunity to be heard on this point at that time, but instead proceeded to a discussion of the fraud on the market. In short, it was never made clear at the outset which of the theories of reliance, or whether both theories, were being advanced.

13. It is also noted that, after the Hearing, plaintiffs' counsel furnished the court and counsel for PMM with a copy of a separate, new complaint asserting claims against Finkle & Ross (the accounting firm which had been auditing Coated Sales prior to the appointment of PMM) and certain individual defendants for, among other things, misstatements contained in earlier Coated Sales financial reports (the "Finkle & Ross Complaint"). This new action, which will be consolidated with the present action, involves a complaint which contains far more specificity on the issue of reliance and the character of the market for Coated Sales stock than is contained in the Amended Complaint. As suggested at the Hearing, and indicated below (footnote 21), plaintiffs should be granted leave to further amend the Amended Complaint to set forth the allegations supporting reliance. To the extent such amendment effects specific allegations concerning direct reliance and therefore the fraud on the market theory becomes moot, it is arguable plaintiffs should be ordered to pay the substantial costs of briefing the fraud on the market theory issues during the past several months. It was made clear at the Hearing, however, that, notwithstanding direct reliance, fraud on the market continues to be a major theory relied upon by several plaintiffs in this case.

While it was stated at the Hearing this motion would be treated under Rule 56, counsel for PMM has requested that, in light of the Finkle & Ross Complaint, the Amended Complaint be dismissed, even if plaintiffs are permitted to refile a new complaint tracking the language in the Finkle & Ross Complaint. Plaintiffs should clean up the Amended Complaint and clarify the parameters of the facts and issues in this case. Because plaintiffs do not appear to have pressed the fraud on the market theory frivolously, and the additional amendment of the Amended Complaint will occur, in part, as a result of PMM's request, sanctions do not appear appropriate at this time.

14. While plaintiffs will, of course, be free to prove to a jury whatever forms of reliance existed in this case, it is noted that forms of individual reliance (direct and indirect) were asserted with specificity for the first time when an evidentiary hearing concerning the existence of an efficient market (and, therefore, the availability of the fraud on the market presumption) was proposed. One of plaintiffs' chief arguments against such a hearing, discussed *infra*, was that dismissal of the fraud on the market theory would not abbreviate this case in any event because at least *some* plaintiffs need not invoke it.

able, of course, all plaintiffs can assert fraud on the market and obviate the need to prove individual reliance (at least as to the federal securities law claims [15]). While there may ultimately exist other issues concerning reliance in this case (some of which may be legal), PMM's motion is treated as a Rule 56 motion to dismiss the fraud on the market theory in this case because it contends, as a matter of law, Coated Sales stock traded in an inefficient market. PMM's motion to dismiss the state law claims, which require direct reliance, is also treated under rule 56.

■ The Amended Complaint alleges Kagan was Assistant Secretary and Director of the Company. In addition, Kagan derived personal income from Coated Sales as counsel to the company during the Class Period.[16] On June 29, 1987, Kagan sold 2,000 shares of Coated Sales common stock. During the period between April 13, 1988 and April 18, 1988, Kagan sold an additional 10,000 shares of common stock of Coated Sales which yielded approximately $125,000. Amended Complaint at ¶ 6(f). In addition, as part of its allegations against "all defendants," the Complaint basically alleges Kagan had readily available to him the underlying facts concerning the financial misstatements and he either knowingly or wrecklessly participated in the Coated Sales fraud. Complaint ¶ 50.

*Discussion*

### I. *Fraud on the Market Theory*

■ Plaintiffs have alleged PMM audited Coated Sales' financial statements for fiscal year 1987 and that PMM issued an unqualified opinion on those financials. Section 10 of the Exchange Act provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Subsequent to passage of the Exchange Act, the SEC promulgated Rule 10b-5, providing that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) to employ any device, scheme, or artifice to defraud,
>
> (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading, or
>
> (c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit

Plaintiffs contend that facts contained in public documents may be considered in connection with a motion to dismiss (citing *Papasan v. Allain,* 478 U.S. 265 n. 1, 106 S.Ct. 2932 n. 1, 92 L.Ed.2d 209 (1986)). Kagan has not contended that possible consideration of the above fact should convert his motion into a summary judgment motion under Rule 56. It is noted further that, while the amount of legal fees is *somewhat* relevant to the issue of knowledge on the part of Kagan (or his law firm) concerning Coated Sales business practices, I do not consider the exact dollar amount of fees earned by Kagan's law firm crucial to Kagan's present motion.

---

**15.** As discussed *infra,* plaintiffs' state law claims depend, for their validity, on direct reliance. While the plaintiffs may, as a group, survive PMM's motion to dismiss the federal securities law claims because factual questions exist concerning the "character of the market," only those plaintiffs who assert direct reliance will survive PMM's motion to dismiss the state law claims.

**16.** For its legal services, Kagan's law firm received $326,665 in fiscal 1986. This fact is not set forth in the Amended Complaint, but is instead gleaned from Coated Sales' Exchange Act reports. It was previously noted Kagan's motion would be treated under Rule 12(b)(6).

upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5. To prevail in an action brought under Rule 10b–5, a plaintiff must establish six elements: (1) a false representation of (2) a material (3) fact; (4) defendant's knowledge of its falsity and his intention that plaintiff rely on it; (5) the plaintiff's reasonable reliance thereon; and (6) his resultant loss. *See Peil v. Speiser,* 806 F.2d 1154, 1160 (3d Cir.1986); 3 Loss, *Securities Regulation* 1431 (1961). While there is little dispute plaintiffs asserting § 10(b) claims must generally satisfy all of these requirements, only the reliance requirement is of concern here.

It is settled a plaintiff asserting a claim under Rule 10b–5 can satisfy the reliance element by asserting, in appropriate cases, the fraud on the market theory rather than alleging direct reliance on a defendant's misrepresentations. *See Basic v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 989–91, 99 L.Ed.2d 194 (1988); *Peil v. Speiser,* 806 F.2d at 1160–1161; *Blackie v. Barrack,* 524 F.2d 891, 907 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). As the Supreme Court succinctly explained in *Basic:*

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant

than in a case of direct reliance on misrepresentations."

108 S.Ct. at 988–89 (citations omitted). A specific holding in the Third Circuit's *Peil* decision was that "plaintiffs who purchase in an open and developed market need not prove direct reliance on defendants' [material] misrepresentations"—only that defendants made such misrepresentations. 806 F.2d at 1161.

Although *Peil* makes it clear "the fraud on the market theory rests on the assumption that there is a nearly perfect market of information," *id.* at 1161 n. 10, the Third Circuit affirmatively declined to specifically define the term "open and developed market." [17] It stated that "[a]s the case at bar involves a widely traded and established stock, we need not consider whether we would apply the fraud on the market theory in other instances." *Id.* This unanswered question in *Peil* goes to the heart of PMM's motion.

PMM does not question the validity of the fraud on the market theory in general, but argues it has no application here, because plaintiffs have failed to allege (and cannot prove as a matter of fact) Coated Sales stock trades actively in an "open and developed" securities market, such as the New York or American Stock Exchanges. PMM also points out Coated Sales was not such a seasoned company that it was entitled to register new securities using SEC Form S–3.

As indicated above, the Company's stock traded in the "over-the-counter" market. Although some may concur with PMM's suggestion—which was doubtless unintended—that companies listed on national stock

---

**17.** Definitions of the key terms which underlie the fraud on the market theory were offered by commentators Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud,* § 8.6 (Aug. 1988) ("Bromberg"):

—An open market is one in which anyone, or at least a large number of persons, can buy or sell.

—A developed market is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).

—An efficient market is one which rapidly reflects new information in price.

These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one. *Id.*

exchanges [18] or companies entitled to issue new securities using SEC Form S–3 would almost by definition involve stocks trading in an "open and developed" market, it is less clear that companies without these distinctions necessarily trade outside of an "open and developed" market.

Plaintiffs have cited in their briefs cases in which the fraud on the market theory was allowed where the stock in question was traded in the over-the-counter market. *E.g., Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356 (5th Cir.1987), *cert. denied*, — U.S. ——, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988); *Teichler v. DSC Communications Corp.*, No. CA3–85–2005–T (N.D.Tex. Apr. 26, 1988); *In re Electro–Catheter Secs. Lit.*, [1987–88] Fed.Sec.L.Rep. (CCH) ¶ 93,643, 1987 WL 47375 (D.N.J. Dec. 3, 1987); *Gavron v. Blinder Robinson & Co., Inc.*, 115 F.R.D. 318 (E.D.Pa.1987); *Klein v. A.G. Becker Paribas, Inc.*, 109 F.R.D. 646 (S.D.N.Y.1986); *Mottoros v. Abrams*, 524 F.Supp. 254 (N.D.Ill.1981). In none of these cases, however, was the question of whether the over-the-counter stock traded in an efficient or developed market squarely addressed.

PMM, on the other hand, has referred in its briefs to at least two cases which contain language suggesting that stocks trading over-the-counter are not ripe for application of the fraud-on-the-market theory. *See Epstein v. American Reserve Corp.*, No. 79 C 4767, 1988 WL 40500 (N.D.Ill. 1988); *In re Data Access Systems Securities Litigation*, 103 F.R.D. 130, 138 (D.N.J. 1984) (dicta), *rev'd on other grounds*, 843 F.2d 1537 (3d Cir.1988). These cases, however, do not provide any analysis of why over-the-counter stocks do not qualify for fraud-on-the-market treatment. They sim-

ply conclude such stocks do not trade in "open and developed" markets.

The question of whether the fraud on the market theory can substitute for direct reliance in any given case is both a legal and a factual one: is the market in which a particular company's stock trades efficient and well-developed. *See generally Fleming, Securities Fraud—Third Circuit adopts Fraud–On–The–Market Theory of Causation In 10b–5 Actions*, 32 Vill. L.Rev. 913, 936 N. 85 (1987) (hereinafter "Fleming") ("term 'developed markets' generally refers to large impersonal, actively traded markets…. Such markets can be contrasted with 'undeveloped markets', such as thin markets and markets for new offerings and restricted resale securities" (citing cases)). There must, then, be a factual inquiry [19] made into whether Coated Sales stock was traded on a "thin market."

Before discussing the kinds of facts which suggest the existence of an efficient ("open and developed") market, it is important to address two points. First, it is necessary to state why the Rule 56 standard rather than the Rule 12(b)(6) standard is applied to PMM's motion. Second, it is important to address two bright-line tests for efficiency of the market offered by PMM. In short, PMM submits that listing on a national stock exchange or status as an issuer eligible to register securities on SEC Form S–3 should be considered prerequisites to an efficient market. PMM argues that, because Coated Sales stock fails to meet either of the two bright-line tests, the court should conclude the market in question is inefficient as a matter of law.

*Applicable Standard*

As indicated, PMM and Kagan have brought their motions as motions to dis-

---

**18.** "[T]he NASDAQ over-the-counter market is not considered to be a 'national securities exchange' within the meaning of Section 9 of the Exchange Act, 15 U.S.C. § 78i." *Gavron v. Blinder Robinson & Co., Inc.*, 115 F.R.D. 318, 320 n. 3 (E.D.Pa.1987).

**19.** As discussed in greater detail below, plaintiffs argue the factual inquiry concerning the character of the market is, under the Seventh Amendment, for the jury to make. Because PMM's motion has merely called into question

whether a judicial presumption (that indirect reliance existed by virtue of the efficient market) should exist, however, plaintiffs' Seventh Amendment arguments are misplaced. All that was contemplated in connection with the proposed evidentiary hearing was that further data be presented to be considered together with the Poser Affidavit submitted by plaintiffs—so an informed decision as to the availability of such a presumption could be made.

miss under Rule 12(b)(6). If PMM's fraud on the market motion were to be treated under Fed.R.Civ.P. 12(b)(6), the question would be whether plaintiffs have alleged in the Amended Complaint that the Company's stock traded in an efficient or "open and developed market," *Peil, supra,* 806 F.2d at 1161, or whether any of the facts alleged give rise to such an inference. As the Supreme Court stated in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957):

> In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Accord, Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *Angelastro v. Prudential–Bache Securities,* 764 F.2d 939 (3d Cir.1985), *cert. denied,* 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985). Indeed, the Supreme Court has stated that a Rule 12 motion should not succeed unless the complaint is found to be "wholly frivolous." *Radovich v. National Football League,* 352 U.S. 445, 453, 77 S.Ct. 390, 395, 1 L.Ed.2d 456 (1957). As articulated in this Circuit, the standard to be applied in a motion under Fed.R.Civ.P. 12(b)(6) is whether, after construing the pleading in the light most favorable to the plaintiff, and resolving every doubt in his favor, the pleading states any valid claim for relief. *Mortensen v. First Federal Savings and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977).

■ The Amended Complaint, however, does not contain any specific allegations that Coated Sales stock traded in an efficient or "open and developed" market. Nor does it allege the kinds of facts, discussed below, from which it can be inferred Coated Sales traded in such a market.[20] Plaintiffs' counsel, Milberg Weiss, submitted an amicus brief to the Supreme Court in the *Basic* litigation on these very issues and are keenly aware of the pleading requirements to invoke the fraud on the market theory.

■ While the Amended Complaint—which is the product of twenty-nine capable law firms collaborating on essentially the eighteenth draft—is void of facts which would support the invocation of the fraud on the market theory, plaintiffs have belatedly submitted the Poser Affidavit and numerous other submissions which, they argue, amply demonstrate the efficiency of the market. Furthermore, plaintiffs have requested leave to amend the Amended Complaint yet another time to assert the additional facts contained in the Poser Affidavit should it be determined the Amended Complaint, as currently drafted, is insufficient. Plaintiffs' Third Brief, p. 10.[21]

---

**20.** Plaintiffs submit the Amended Complaint does allege facts which establish the efficiency of the market for the Company's stock. Such allegations include the following: (i) "[a]pproximately 19,000,000 Coated Sales shares were outstanding as of June 16, 1988, and there were approximately 1,200 holders of record of the common stock," (¶ 10) and (ii) the market price for Coated Sales stock reacted immediately to adverse information. (¶¶ 34–35) Plaintiff's Third Brief, p. 8. While, as discussed below, such allegations are relevant to the market's efficiency, they do not, in themselves, sufficiently give rise to an inference of efficiency.

**21.** It is settled that leave to file amendments of the pleadings under Rule 15(a) is in the discretion of the Court and should be granted freely. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 *reh'g denied,* 401 U.S. 1015, 91 S.Ct. 1247, 28 L.Ed.2d 552 (1971). The most important factor in deciding whether to grant leave to amend is whether the non-moving party will suffer prejudice as a result of the amendment. *Cornell & Co. v. Occupational Safety and Health Review Commission,* 573 F.2d 820 (3d Cir.1978). "[T]he non-moving party must do more than simply claim prejudice; it must show that it will be unfairly disadvantaged or deprived of the opportunity to present facts or evidence...." *Hill v. Equitable Bank, N.A.,* 109 F.R.D. 109 (D.Del.1985). PMM has not demonstrated it would suffer unfair prejudice if plaintiffs were permitted to further amend the Amended Complaint. Although it has been required to incur substantial costs and time in bringing its motion, the fraud on the market was, and continues to be, a dominant issue in this case. Furthermore, PMM has not suffered prejudice in the sense that it has been deprived of the opportunity to present evidence.

PMM, on the other hand, previously argued plaintiffs have already filed eighteen complaints and "enough is enough." PMM contended "while leave to amend is freely granted" under Fed.R.Civ.P. 15, it should not be granted here where, even considering the contents contained in plaintiffs' new submissions, plaintiffs cannot prove Coated Sales (trading in the over-the-counter market) trades in an efficient market. PMM's Third Brief, pp. 46–47. The Amended Complaint, as currently drafted, is woefully deficient as far as the "fraud on the market theory" is concerned (and plaintiffs have had more than ample opportunity to perfect the pleadings); however, it appears genuine factual issues concerning the "character of the market" have been raised by plaintiffs' recent submissions. Plaintiffs' request for leave to further amend the Amended Complaint to set forth the facts, detail and allegation as set forth in the Finkle & Ross Complaint is granted. *See* discussion at footnote 10.

Although leave has been granted to allow plaintiffs to further amend the Amended Complaint, for present purposes consideration will be given to the contents of the Poser Affidavit (along with other recent submissions) and PMM's Rule 12(b)(6) motion will be treated as a motion for summary judgment under Rule 56.

■ The Federal Rules of Civil Procedure provide that a Rule 12(b)(6) motion to dismiss for failure to state a claim shall be converted to a motion for summary judgment under Rule 56 whenever matters submitted outside the pleading are considered by the court. Fed.R.Civ.P. 12(b).[22] Because of the review and consideration of matters outside the pleading in this case which are sufficient to require a determination of the motion on summary judgment, the summary judgment standard under Fed.R.Civ.P. 56 will be applied.[23]

■ To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The district court's task is to determine whether disputed issues of fact exist, but the court cannot resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *See Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a fact issue,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' ... Where the record taken as a whole could not lead a rational

**22.** The relevant part of the rule reads as follows: If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56. Fed.R.Civ.P. 12.

**23.** The notice of motion in this case indicates PMM is moving pursuant to Rules 12(b) of the Federal Rules of Civil Procedure for an order dismissing the complaint. It was suggested at a hearing on November 14, 1988 that perhaps Rule 56 should apply. Furthermore, PMM has indicated in its submissions that it has attempted not to "pre-try the issues" in this case. PMM's Third Brief, p. 2. While perhaps for this reason PMM has not submitted an affidavit, it had ample opportunity to do so—the Poser Affidavit having been submitted by plaintiffs on December 13, 1988. Thus, both parties had the opportunity to present all materials relevant to a summary judgment motion. *See Rose v. Bartle*, 871 F.2d 331, 340–41 (3d Cir.1989). Whatever affidavit PMM might have submitted, of course, it would not have dispelled the existence of a genuine factual issue created by the Poser Affidavit. *See* discussion at footnote 48.

**1280**

trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted).

■ The Court elaborated on the standard in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted): "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." The Supreme Court went on to note in *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986) (footnote omitted): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." Thus, once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *See* Fed.R.Civ.P. 56(e).

PMM argues the Amended Complaint should be dismissed as a matter of law because (1) Coated Sales stock was not listed on a national stock exchange and (2) Coated Sales was not eligible to register new stock using SEC form S–3. Although PMM has raised interesting questions by arguing Coated Sales fails to meet either of these bright-line tests for the reasons stated below, neither of the two tests will be adopted. Furthermore, summary judgment is inappropriate because genuine issues of material fact concerning the character of the market for Coated Sales stock have been created by the Poser Affidavit.

### The Over–the–Counter Market

It is PMM's position that only stocks trading on either the New York or American stock exchanges should be eligible for fraud on the market treatment. The focus, according to PMM, should be on the broader (or "whole") market in which a security trades (in the case of Coated Sales, the over-the-counter-market [24]), not on an "individual market" for a *specific* security which happens to trade within the context of a larger, "whole" market.

PMM argues the leading cases discussing the fraud on the market theory, *e.g. Basic* and *Peil,* involved defendants which were national stock exchange listed companies and that the decisions in those cases depended entirely upon the empirical market studies [25] referred to therein—which in every case involved national exchanges.

*In re LTV Securities Litigation,* 88 F.R. D. 134 (N.D.Tex.1980), explained:

"The reasonableness of a presumption turns either on the empirical validity of the fact presumed or upon a policy sufficient to justify placing the burden of proof where it would not naturally be under our adversary system. Recent economic studies tend to buttress empirically the central assumption of the fraud on the market theory—that the market price reflects all representations concern-

---

**24.** As discussed below, Coated Sales trades within a specific grouping of over-the-counter stocks, the NASDAQ/National Market System, which is a grouping of the larger and better known over-the-counter companies. Because PMM "draws the line" at "national exchanges," however, it considers National Market System status irrelevant, preferring to refer to Coated Sales as merely an over-the-counter security.

**25.** The leading academic study on the efficient market hypothesis was conducted by Eugene Fama. He predicated his analysis on "the assumption that security prices at any time 'fully reflect' all available information. A market in which prices always 'fully reflect' available information is called 'efficient.'" Fama, *Efficient*

*Capital Markets: A Review of Theory and Empirical Work,* 25 J.Fin. 383 (1970).

Farma discussed three informational subsets which underlie the efficient-capital-market-hypothesis:

"First, *weak form* tests, in which the information set is just historical prices.... Then *semi-strong form* tests, in which the concern is whether prices efficiently adjust to other information that is obviously publicly available (*e.g.,* announcements of annual earnings, stock splits, etc.).... Finally, *strong form* tests concerned with whether given investors or groups have monopolistic access to any information relevant for price information...."

*Id.* at 383.

ing the stock. Indeed, economists have now amassed sufficient empirical data to justify a present belief that widely-followed securities of the larger corporations are 'efficiently' priced: the market price of stocks reflects all available public information—and hence necessarily, any material misrepresentations as well." (citations omitted) *Id.* at 144.

■■■ PMM emphasized the fact that the four finance theory texts cited by Judge Higginbotham in *LTV Securities* studied New York Stock Exchange trading. PMM further argues "there has never been a rigorous economic study of the efficiency of the over-the-counter market." PMM's Third Brief, p. 12. While research has not revealed an empirical academic study of the over-the-counter-market (focusing particularly on whether there exists the requisite efficiency for the fraud on the market theory), the absence of such a study is not conclusive on the issue of whether the over-the-counter market is efficient.

As further support for its argument that the focus should be on "whole markets," PMM refers to Fama's article, where it is stated: "the ideal is a market ... in which ... investors can choose among ... securities...." *Fama, supra,* at 383. PMM also relies on a passage contained in *Basic,* 108 S.Ct. at 992, which, it is argued, looks not explicitly to the particular company but to whether "the shares were traded on an efficient market". PMM's Second Brief, p. 8 n. 7.

The above citations, however, do not persuasively support the fine distinction PMM seeks to have made. Examining the above quotations in context, it is not clear the authors were considering the differences between "markets as a whole" and the notion of sub-markets for individual securities within a larger market. The distinction was more squarely addressed in *Harman v. Lyphomed, Inc.,* 122 F.R.D. 522 (N.D.Ill.1988):

"the question is always whether the stock trades in an efficient market, i.e. one in which material information on the company is widely available and accurately reflected in the value of the stock. *Basic,* 108 S.Ct. at 991 and n. 24 (citing studies). *While some over-the-counter stocks no doubt trade in a less developed market than some New York Stock Exchange issues, the inquiry in an individual case remains the development of the market for that stock, and not the location where the stock trades."* (emphasis added).

*Id.* at 525. *See also Bromberg, supra,* ("For [fraud on the market theory] purposes, *each security has a distinct market.* A market in the broad sense of the place or mechanism by which securities are traded—such as a stock exchange—*can be open, developed or efficient for some securities listed there and not for others."*) (emphasis added). *Id.* at § 8.6.

■■■ It would be illogical to apply a presumption of reliance merely because a security is traded within a certain "whole market", without considering the trading characteristics of the individual stock itself. Some well-followed stocks, such as Apple Computer and MCI Telecommunications, have chosen to trade in the over-the-counter market rather than on a national exchange. On the other hand, some companies listed on national stock exchanges are relatively unknown and trade there only because they met the eligibility requirements. While the location of where a stock trades might be relevant,[26] it is not dispositive of whether the "current price reflects all available information."

After holding out relatively unpersuasive authority for the proposition that the focus should be on the over-the-counter market as a whole, not the market for an individual stock, PMM discusses at great length why a stock traded in the over-the-counter market is unworthy of inclusion in a fraud on

---

**26.** It is not the mere status of national stock exchange listing (or of an issuer eligible to use Form S–3) that implies a market for a stock is efficient. It is, rather, that certain underlying characteristics more often than not will be associated with companies listed on national exchanges.

the market theory cause of action. PMM argues:

> The over-the-counter market has been variously described as "an inefficient market," as "thinly traded and very inefficient," "where floats and trading characteristics are so limited that only a tiny portion of investors are comfortable investing," as a "woebegone marketplace" where "investors must twiddle their thumbs for days or weeks, waiting for the chance to buy or sell at a reasonable price," as a "thin and skittish" market— "the financial version of a greasy spoon restaurant, where the prices are cheap and you always end up with heartburn," —"as the Casbah of the securities industry, the haven for insignificant, risky, even shady stocks."

PMM's Third Brief, pp. 15–16 (citations omitted). PMM goes on to explain the differences in the trading environments and mechanics in the context of national exchanges on the one hand, and the over-the-counter market on the other.[27] PMM's argument appears to be that, because the regulations governing traders and "specialist units" at the national exchanges are more rigid, there is greater liquidity and greater maintenance of an orderly market.

The primary impression created by PMM's submission is that, without reference to individual stocks, the national exchanges might be somewhat better equipped to consistently assure investors the ability to execute instantaneous (*i.e.* within seconds of seeking bid quotations) trades. Although it may have intended to, PMM has not compelled the conclusion that the over-the-counter market is virtually illiquid or stagnant as is, for example, the market for privately placed securities with only a handful of holders.

 The distinctions between the trading atmospheres (at the national exchanges vs. the over-the-counter market) appear to have been over-emphasized by PMM in its effort to discount the importance of the market for a particular stock. The central question under the fraud on the market theory is whether the stock price, *at the time a plaintiff effected a trade*, reflected the "misinformation" alleged to have been disseminated. If PMM's submissions suggest anything, it is the possibility that the inflated financial statements contained in the financial reports at issue (to the extent they may have induced trading) might have been reflected in the stock price *somewhat more quickly* if Coated Sales had been listed on a national stock exchange rather than traded over-the-counter.

There has been no suggestion, however, that this case, as far as most plaintiffs are concerned, boils down to a "matter of seconds." It appears the individual plaintiffs acquired their Coated Sales stock over a fairly broad period of time. Thus, on the issue of whether the stock price already reflected the import of the financial reports by the time particular investors made their purchases, the fine distinctions PMM seeks to have made do not appear relevant.

 The issue here is whether market makers in the over-the-counter market, specifically the market for Coated Sales stock, provided a sufficiently fluid and informed trading environment so that when material information about Coated Sales was dis-

---

27. In its brief, PMM has explained how "specialist units"—which are each individually responsible for creating a market in specific stocks— are at the center of the trading apparatus in place at the national exchanges. The roles of the specialist units are contrasted with the roles of the "market makers"—of which there may be several for a specific stock—in the over-the-counter market. PMM suggests national exchanges are more fluid because, among other things, the specialist units are, under applicable rules and regulations, subject to a higher duty to maintain an orderly market in a particular stock. Furthermore, whereas the national exchanges involve a physical exchange where trad-ers come together, the trades made in over-the-counter stocks involve reliance on a system of interwoven telephone lines. PMM has also set forth data suggesting many securities professionals consider the national exchanges superior, from the point of view of liquidity and other matters, to the over-the-counter market. The differences in the trading mechanics and environments are also set forth in some detail in the Report of the Presidential Task Force on Market Mechanisms (January 1988) (the "Brady Report"), which summarizes the conclusions drawn after an investigation into the causes of the 1987 stock crash.

seminated, investors had available to them an opportunity to trade at informed, and therefore appropriate, bid and asked prices.

There are several different characteristics pertaining to the markets for individual stocks which are probative of the degree to which the purchase price of a stock should reflect material company disclosures. PMM seeks to have important distinctions drawn based upon subtle differences between the trading atmospheres at the national exchanges and the over-the-counter market. There appears to be, as of yet, no reasoned precedent for such distinctions. Furthermore, it has been said federal courts lack the expertise to evaluate securities markets and formulate substantive rules of law based on such evaluation and that Congress is better equipped for such tasks.[28]

Plaintiffs, in response to PMM's condemnation of the over-the-counter market generally, have focused on Coated Sales and the particular sub-market in which it trades. First, plaintiffs stress Coated Sales traded on NASDAQ's premier "National Market System," a grouping of the largest and most widely followed over the counter stocks. Plaintiffs' Second Brief, p. 6.[29] Second, plaintiffs submitted the Poser Affidavit which contains a detailed analysis of the characteristics pertaining specifically to the stock of Coated Sales.[30] In addition, plaintiffs have constructed comparisons of the relevant characteristics of Coated Sales stock with those of the stocks at issue in *Peil* and *Basic.* As indicated above, the more persuasive reasoning indicates the proper inquiry involves the market for the specific security at issue.

> During the Class Period, some 44 million shares of Coated Sales stock were traded, representing an average weekly trading volume of 750,000 shares....;
>
> Investors had ready access to price quotations for Coated Sales stock through the daily financial press, and to current quotations through their brokers....;
>
> Coated Sales had 11 marketmakers who issued competing price quotations on the NASDAQ system, ... including Merrill Lynch, Dean Witter, Prudential–Bache and A.G. Edwards;
>
> \* \* \* \* \* \*
>
> Coated Sales was the subject of substantial interest by analysts. At least 15 research reports on the Company were issued from July 1987 through June 1988....
>
> Coated Sales utilized the services of a public relations firm and issued numerous press releases concerning its business operations....
>
> The market for Coated Sales stock reacted quickly and dramatically to the disclosure of PMM's resignation and again later when further details of the fraud were made public....

Plaintiffs' Second Brief, pp. 12–14 (summarizing the content of the Poser Affidavit). *See generally, Bromberg, supra,* § 8.6 ("Measurable characteristics for the particular security include number of market makers (if traded off a stock exchange), number of trades, number of shares or units traded, turnover (proportion of outstanding shares or units traded in a given time), size of float, number of shareholders and number of institutional holders. Most of these characteristics are widely available in published financial media").

**28.** *See Basic, supra* (White, J., dissenting) ("But with no staff economists, no experts schooled in the 'efficient-capital-market-hypothesis,' no ability to test the validity of empirical market studies, we are not well equipped to embrace novel constructions of a statute based on contemporary microeconomic theory.... The Congress, with its superior resources and expertise, is far better equipped than the federal courts for the task of determining how modern economic theory and global financial markets require that established legal notions of fraud be modified.") *Id.* at 994–995.

**29.** Those securities for which "real-time prices" are available are known as the National Market System ("NMS") securities. At the end of 1986, prices were available for 2,695 NASDAQ securities, meeting certain higher criteria; e.g., the number of shares and the market value of the public float. The Brady Report compares the criteria for common stocks for inclusion in NMS with those for other NASDAQ securities. Brady Report at VI–13.

**30.** The following facts have been asserted which are relevant to the market for Coated Sales stock:

> Coated Sales stock was traded in an impersonal market involving brokers, rather than in face-to-face transactions;
>
> During the Class Period, 19 million shares of Coated Sales stock were outstanding, of which some 12 to 13 million shares were owned by non-insiders of the Company ... (the "public float");
>
> Coated Sales stock was held by 1200 shareholders of record; ... and it is likely that there were thousands of additional beneficial owners;

*Status As An Issuer Eligible to Use SEC Form S–3*

In *Lyphomed, supra,* a recent decision specifically rejecting the argument that an over-the-counter stock is ineligible for fraud on the market treatment, the district court placed particular emphasis on the fact that the company was a registrant using SEC Form S–3. The court stated the SEC's explicit rational for the integrated disclosure system is that information on companies which file on Form S–3 is widely available in the market and therefore need not be disseminated in the prospectus. 122 F.R.D. at 525 n. 1. *See* Black, *Fraud on the Market: A Criticism of Dispensing with Reliance Requirements in Certain Open Market Transactions,* 62 N.C.L. Rev. 455, 468 (1984). According to the court in *Lyphomed,* "the SEC established reporting requirements for LyphoMed on the premise that the stock traded in an open and efficient market." *Id.*[31] PMM argues that because Coated Sales was not eligible throughout the Class Period to issue new securities on SEC Form S–3, the fraud on the market theory should be held inapplicable as a matter of law.[32]

■ The following SEC releases explain the rationale for allowing older, "more seasoned," companies to fulfill disclosure obligations through integration (i.e., incorporation of old SEC documents into registration statements by reference).

The concept of integration also proceeds from the observation that information is regularly being furnished to the market through periodic reports under the Exchange Act. This information is evaluated by professional analysts and other sophisticated users, is available to the financial press and is obtainable by any other person who seeks it for free or at nominal cost. To the extent that the market accordingly acts efficiently, and this information is adequately reflected in the price of a registrant's outstanding securities, there seems little need to reiterate this information in a prospectus in the context of a distribution.

SEC Securities Act Release No. 6235, 45 Fed.Reg. 63,693 (1980), reprinted in Fed. Sec.L.Rep. (CCH) Spec.Regs. No. 875, second extra ed. (Sept. 10, 1980). As stated by the SEC:

Under the proposed registration statement framework, registrants would be classified into three categories: (1) companies which are widely followed by professional analysts; (2) companies which have been subject to the periodic reporting system of the Exchange Act for three or more years, but which are not widely followed; and (3) companies which have been in the Exchange Act reporting system for less than three years. The first category would be eligible to use proposed Form S–3, which relies on incorporation by reference of Exchange Act reports and contains minimal disclosure in the prospectus. *This form is predicated on the Commission's belief that the market operates efficiently for these companies, i.e., that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place.*

\* \* \* \* \* \*

Proposed Form S–3 recognizes the applicability of the efficient market theory to the registration statement framework

---

31. The eligibility requirements for registering new equity securities on SEC Form S–3 are set forth in footnote 5.

32. Plaintiffs, in response, argue Coated Sales met all Form S–3 requirements except that it was not public for the requisite thirty-six months until August, 1987, three months into the Class Period. Plaintiffs' Second Brief, p. 16 n. 3. They also argue the Form S–3 distinction should not be relevant here because there has not been a recent Coated Sales public offering. The validity of plaintiffs' first argument is ap-

parent (that the right to enjoy the availability of the fraud on the market theory should not turn on arbitrary bright lines); the second argument, however, misses the point. The issue is not whether Coated Sales recently completed a public offering, but whether, if it did, it would enjoy the benefit of making abbreviated prospectus disclosure because the SEC viewed it to be in an efficient market where documents "on file" could be deemed to be known by the investment community.

with respect to those registrants which usually provide high quality corporate reports, including Exchange Act reports, and whose corporate information is broadly disseminated, because such companies are widely followed by professional analysts and investors in the market place.

SEC Securities Act Release No. 6331, 46 Fed.Reg. 41,902, reprinted in Fed.Sec.L. Rep. (CCH) Spec.Regs. No. 926, extra ed. (Aug. 13, 1981) (emphasis added).

Because of the foregoing observations made by the SEC, the existence of Form S–3 status is an important factor weighing in favor of a finding that a market is efficient. Unlike in *Lyphomed* where the company *was* eligible to use Form S–3, however, the question in this case is how devastating is the absence of Form S–3 status to plaintiffs' Amended Complaint. Furthermore, as noted above, Coated Sales was on the verge of being able to register securities on Form S–3. Such entitlement comes from issuing Exchange Act reports for 36 months (Coated Sales fell three months short) *and* from having a sufficient "float."

As far as the SEC is concerned, the three year reporting history is important to the decision to allow integrated disclosure because there is no need to re-state in a prospectus what has already been recently disclosed in public documents. The "public float" aspect of the Form S–3 requirements ensures that enough investors have in fact read the previously filed document.[33] In short, therefore, in assessing the importance of the status (or lack of it) as a Form S–3 issuer, focus is directed to the number of shareholders and market capitalization.

With the rejection, in the context of its current motion, of the two bright-line tests offered by PMM, attention now shifts to a summary of the facts which could have been alleged to justify invocation of the fraud on the market theory, many of which were belatedly stated in the Poser Affidavit.

The Supreme Court in *Basic* seemingly approved of the elements set forth by *Peil* as those necessary before a plaintiff can invoke the fraud on the market theory.[34] Included among the elements, *Peil* and *Basic* unambiguously require a plaintiff to allege: "(3) that the shares were traded on an efficient market." *Basic*, 108 S.Ct. at 992 n. 27. From a close examination of the Amended Complaint, however, all that can be gleaned is that Coated Sales traded in the "over-the-counter" market and had approximately 19,000,000 shares of stock outstanding, which are held by approximately 1200 holders. In addition, the Complaint states: "Without knowing of the falsity of the reports and statements described above, plaintiffs and class relied, to their damage, on those reports and statements *and/or* on the integrity of the market of Coated Sales stock." Amended Complaint ¶ 55. Although the number of shares outstanding and number of holders may be relevant to the character of the market for Coated Sales stock, the allegation contained in ¶ 55 of the Amended Complaint, that plaintiffs relied upon the "integrity of the market," merely begs the question of whether the market was "open and well developed."

There are several types of facts which, if alleged, might give rise to an inference that Coated Sales traded in an

---

**33.** It is this aspect of the Form S–3 requirements that calls into play the efficient market hypothesis.

**34.** The Third Circuit held in the *Basic* case that "[i]n order to invoke the presumption of reliance based upon the fraud on the market theory, a plaintiff must allege and prove five elements. A plaintiff must demonstrate (1) that the defendants made public misrepresentations, (2) that the misrepresentations were material, (3) that the stock was traded on an efficient

market, (4) that the misrepresentations would induce a reasonable, relying investor to misjudge the value of the stock, and (5) that the plaintiff traded in the stock between the time the misrepresentations were made and the time the truth was revealed." *Levinson v. Basic*, 786 F.3d 741, 750 (6th Cir.1986). The Supreme Court essentially approved of these elements but noted elements (2) and (4) may collapse into one. *Basic*, 108 S.Ct. at 992, n. 27.

efficient market.[35] It is useful to set forth an explanation of how the existence of such facts would cause the understanding that disclosed company information (or misinformation) would be reflected in the company's stock price, the underpinning of the fraud on the market theory. *Peil, supra,* 806 F.2d at 1160.

 First, plaintiffs could have alleged there existed an average weekly trading volume during the class period in excess of a certain number of shares.[36] *Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1121 (5th Cir.1988). *See also Finkel v. Docutel/Olivetti Corp.,* 817 F.2d 356, 360 n. 8 (5th Cir.1987) ("The efficient market model is thought to operate in open or 'developed' market transactions, which simply refers to some large, impersonal *actively traded* market") (emphasis supplied); *Bromberg, supra* at § 8.6 (Turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption). The reason the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.

 Second, it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the PMM reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[37] In this way the market price of the stock would be bid up or down to reflect the financial information contained in the PMM reports, as interpreted by the securities analysts.

 Third, it could be alleged the stock had numerous market makers. The existence of market makers and arbitrageurs

**35.** As indicated in footnote 17, it has been suggested by Bromberg an open market is one in which "a large number of persons" can buy or sell. While case law has not specifically defined what would constitute a large number in this regard, the fact of 1200 holders of Coated Sales stock appears significant. Furthermore, there do not appear to be any limits on the number of people who could be Coated Sales stockholders. A developed market is generally one with a "relatively high level of activity," a concept again needing more definitive judicial interpretation. *Compare Fleming, supra,* 32 Vill.L.Rev. at 936 ("undeveloped markets, such as these markets and markets for new offerings and restricted resale securities"). An efficient market, one which rapidly reflects new information in price, is both open and well developed. *Bromberg* at § 8.6.

**36.** Although such an allegation is noticeably absent from the Amended Complaint, plaintiffs, in their brief in opposition to PMM's motion, have constructed a comparative revenue, stock and trading graph, using an American Stock Exchange listed company, Health–Chem, as the basis for comparison. Health–Chem was the company at issue in *Peil.* While it is not concluded whether plaintiffs have isolated determinative information (i.e., number of days trading exceeded 100,000 shares during class period) in that comparison, this type of showing is encouraged. It is noted, however, a variety of corporate events can affect two different companies differently during the comparison period. Just because the same volume of stock trades for the two companies (with similar stockholder portfolios) during a given period, it does not necessarily follow that the companies' stock trades in equally efficient markets.

**37.** Plaintiffs have also argued in this matter that, apart from the fraud on the market theory and the existence of an efficient market, they can establish indirect reliance on the PMM reports because third parties (such as investment advisors or family members) read them and encouraged plaintiffs, or some of them, to invest in Coated Sales stock. As indicated, PMM's current motion has been treated as a motion to dismiss the fraud on the market theory, which, it is presumed, is the theory depended upon by the vast majority of plaintiffs. If it is ultimately concluded there is not an efficient market in this case, and certain plaintiffs can establish, as a factual matter, they relied upon the advice of third parties who read the PMM report, the legal question of the validity of this form of reliance will have to be addressed. Because this issue *may* not be crucial (if it is concluded there is an efficient market), and because it was not the primary focus of briefing, a ruling on the viability of "third-party reliance" is not made at this time.

would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level.

■ Fourth, as discussed, it would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.

■ Finally, it would be helpful to a plaintiff seeking to allege an efficient market to allege empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. This, after all, is the essence of an efficient market and the foundation for the fraud on the market theory.

The law in the Third Circuit is that reliance is presumed "only 'where it is logical' to do so." *Peil v. Speiser, supra,* 806 F.2d at 1161 n. 11 and *Zlotnick v. TIE Communications,* 836 F.2d 818, 822 (3d Cir.1988), both quoting *Sharp v. Coopers & Lybrand,* 649 F.2d 175, 188 (3d Cir.1981), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982). It is not logical to draw bright line tests—such as whether a company is listed on a national exchange or is entitled to register securities on SEC Form S-3—to assist fact finders in determining whether a stock trades in an "open and efficient market." A well established and widely followed company may choose for any number of unrelated reasons not to list itself on a national exchange. Furthermore, there may be a company whose stock trades in an efficient market, but which

just missed or recently failed to meet the qualifications for Form S-3 registrants.

■ While the Amended Complaint does not contain most of the foregoing types of allegations, the Poser Affidavit does. It is curious why, in light of the apparent knowledge of Milberg Weiss that efficiency must be alleged in the Amended Complaint, plaintiffs failed to make these allegations in their early pleadings. For the reasons discussed above, however, this motion is to be treated under the Rule 56 standard with the content of the Poser Affidavit taken into account. The Poser Affidavit has created a genuine issue of material fact concerning the character of the market for Coated Sales stock. Accordingly, PMM's motion for dismissal of the Rule 10b-5 claims must be denied at this time.

## II. *Pretrial Evidentiary Hearing on the Character of the Market for Coated Sales Stock*

The present posture of this litigation raises interesting procedural questions about the types of hurdles a plaintiff should be required to overcome at various stages of a "fraud on the market" lawsuit. In fairness to the parties, a preliminary evidentiary hearing [38] was suggested to examine the availability of the fraud on the market presumption in this case. This approach attempted to avoid the harsh result of dismissing the Amended Complaint. Furthermore, to the extent the fraud on the market theory was inapplicable and plaintiffs could not establish alternative forms of reliance, an early hearing would allow PMM to confront some of the ultimate issues in this case.

It was suggested the parties brief the issue of the appropriateness of a hearing in this context. Research has turned up little

---

**38.** During the past several months, while submissions were being prepared and submitted, counsel to the parties have sometimes referred to the proposed hearing as the first of two stages in a bifurcated trial. This is somewhat of a misnomer. As discussed, it was not intended that conclusive findings of fact, as such, would be made but rather that there be a sufficient quantity of data (in whatever form) submitted by the parties so a determination could be made concerning the availability of the fraud on the market theory, a *rebuttable* presumption of reliance. In support of the presumption in this case, plaintiffs submitted the Poser Affidavit, which is laden with "facts" pertaining to the market for Coated Sales stock.

direct authority on point.[39] Nevertheless, counsel for the parties have made several arguments on the issue, each of which is discussed below. Without attempting to conclusively resolve the questions concerning the types of burdens to be imposed at various stages of litigation on plaintiffs seeking to proceed under the fraud on the market theory, it appears in this case an evidentiary hearing would not be in the interests of fairness to the parties and judicial economy.

■ While plaintiffs may be correct that an evidentiary hearing may not be appropriate in this case (at least at this stage), however, their argument that district courts lack the power to pretest the availability of the fraud on the market theory (a *judicially* created presumption of reliance) in all cases is rejected. As discussed below, it is suggested the inclination of a court to examine, on a preliminary basis, the character of the market for a particular stock should depend in large part on the strength of the plaintiffs' *prima facie* showing that the market is efficient. If there has been a strong showing that the market is efficient, based upon the factors discussed above, a preliminary hearing would probably be unnecessary. If, on the other hand, it is substantially uncertain from the submissions whether a market is efficient (and therefore whether the fraud on the market theory and its presumption of reliance are available to plaintiffs), an early indication from the court on the availability of the fraud on the market theory is in the interest of all parties, whose subsequent needs for discovery can be tailored to the possible need to develop, or rebut, alternative theories of reliance.

In support of a preliminary hearing concerning the availability of a presumption of reliance based upon the fraud on the market in this case, PMM argues section 33.32 of the *Manual for Complex Litigation 2d (1985)* ("MCL 2d") urges trial courts to define and clarify issues such as "whether the plaintiffs may proceed on the theory of a 'fraud on the market'" using techniques such as those described in section 21.33. Section 21.33 of the MCL 2d, in turn, lists "conducting a separate trial under Fed.R. Civ.P. 42(b)[40] of issues which may render unnecessary or substantially alter the scope of further discovery or trial." *Id.* The MCL 2d states: "[I]ssues that affect the scope or extent of discovery or trial ... should be determined as soon as possible." *Id.* Section 21.632 of the MCL 2d encourages the use of Rule 42(b) separate trials: "[S]everance of certain issues for separate trials under Fed.R.Civ.P. 42(b) is often useful ... the results of the first trial may eliminate the need for further proceedings...."

"[I]f a single issue could be dispositive of the case and resolution of it might make it unnecessary to try the other issues, separate trial of the issue may be desirable to save the time of the court and reduce the expense of the parties." 9 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2388 at 280–81 (1971). While the foregoing citations perhaps contemplate a separate trial in the sense that the "facts" concerning the character of the market would be found conclusively in advance of empaneling a jury, that was not what was necessarily contemplated here. As discussed, the proposed hearing here was merely intended to pretest the availability of a rebuttable presumption of reliance.[41]

**39.** As indicated above, the fraud on the market theory is relatively recent and only a few courts have explicitly addressed the issue of whether an over-the-counter stock is ripe for its application. Accordingly, it is not surprising there is little direct authority on the issue of the appropriateness of a hearing in this context.

**40.** Federal Rule of Civil Procedure 42(b) provides in relevant part:
"The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim ... or of any separate issue or of any number of claims ... or issues...."

**41.** It is suggested that, except in the case where virtually no genuine facts are asserted which would support invocation of the fraud on the market theory (which, until the Poser Affidavit was submitted, appeared to be the case here), trial courts holding this type of evidentiary hearing would seldom determine conclusively the market for a stock is inefficient. *See* footnote 48.

Plaintiffs strenuously oppose a hearing, arguing that significant constitutional and other issues may arise if plaintiffs are required to prove, "in a separate trial," that Coated Sales stock trades in an efficient market.[42] Specifically, plaintiffs argue the Seventh Amendment prohibits a partial jury trial on the applicability of the fraud on the market presumption because the issues involved are not separate, independent and distinct from all other issues in the case. Plaintiffs' Second Brief, pp. 25–28.

▉▉▉▉ Plaintiffs stress the evidence relating to the existence of an "open and developed" or efficient market—the focus of the proposed pretrial hearing—would have to be reexamined by a second jury because the evidence relating to these factors is appropriate to a determination of materiality, causation and damages (elements required to be proved in a securities fraud suit under Rule 10b–5).[43] Plaintiffs appear to argue they are entitled, under the Seventh Amendment, to have all of the factual issues in this case addressed only once and by the same jury. Several cases have been cited for the proposition that partial trials should not occur where the issues to be resolved may be relevant to other issues in the case. Plaintiffs rely on *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931) where the Court ruled that a partial trial

> may not properly be resorted to unless it clearly appears that the issue to be retried is *so distinct and separable from the others that a trial of it alone may be had without injustice....* Here the

question of damages on the counterclaim is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to the denial of a fair trial.

283 U.S. at 500, 51 S.Ct. at 515 (citations omitted) (emphasis added). *See also Colonial Leasing v. Logistics Control Intern.*, 770 F.2d 479, 481 (5th Cir.1985) (a partial jury trial was prohibited where case presented "an interdependence of issues" and "an overlapping of proof relevant on the issues."); *State Mutual Life Assurance Co. of America v. Arthur Andersen & Co.*, 63 F.R.D. 389, 394 (S.D.N.Y.1974) (a separate trial would be improper when such trial might subject a party to "possibly differing verdicts on the same facts before two different juries.").

In *Smith v. Alyeska Pipeline Service Co.*, 538 F.Supp. 977 (D.Del.1982), *aff'd* 758 F.2d 668 (Fed.Cir.1984), *cert. denied*, 471 U.S. 1066, 105 S.Ct. 2142, 85 L.Ed.2d 499 (1985) the court explained:

> The central inquiry is whether the issues heard by the second jury ... will be so distinct and independent from those issues heard by the first jury.... Two juries cannot decide factual issues that are common to both trials and which are essential to a verdict or an award. Factual questions resolved by one jury which could be reexamined by another jury, either directly or indirectly, violates (sic) the Seventh Amendment.

*Id.* at 984.

In these cases, however, the issue was whether a jury trial could be bifurcated, such that a litigant would be forced to try

---

**42.** Although plaintiffs continue to oppose a pretrial evidentiary hearing, they appear to rely less on the purported constitutional grounds set forth in Plaintiffs' Second Brief.

**43.** Plaintiffs are correct in recognizing, as far as the individual elements to a Rule 10b–5 lawsuit are concerned, there exist both conceptual interrelationships and evidentiary overlap. As an example, it is noted market efficiency might be demonstrated by showing how the stock price reacted in response to announcements by the Company—including the announcement that PMM resigned because of the accounting irregularities which were discovered. Plaintiffs have

observed that "for the jury to determine the significance of particular stock price movements with respect to the efficiency of the market, it would have to consider the materiality of the disclosures involved, the extent to which such information had earlier been anticipated by the market, whether such information had leaked into the market before formal disclosure, the scope of the dissemination and whether movements in the stock price were caused by the particular disclosures relating to Coated Sales or by other market or industry factors." Plaintiffs' Second Brief, p. 4.

factual issues, concerning substantive elements of the case, in front of different juries—with the possible risk of conflicting verdicts. That is not a problem raised by the proposed pretrial evidentiary hearing in this case. Plaintiffs' right to a jury trial on the merits of each element to their securities fraud lawsuit would be preserved. In the proposed pretrial hearing, plaintiffs would merely be provided an opportunity to demonstrate they are entitled to a judicial presumption of reliance. At such a hearing, consideration would be given to factual data in determining whether Coated Sales stock traded in an efficient market and whether plaintiffs therefore should enjoy a rebuttable presumption of reliance in this lawsuit.

The parties appear to agree that the availability of the fraud on the market theory, as a substitute for actual reliance, is a determination to be made by the trial judge.[44] In *Basic, supra,* 108 S.Ct. 978, the question was framed as follows: "whether it was proper for the courts below to apply a rebuttable presumption[45] of reliance, supported in part by the fraud-on-the-market theory." *Id.* at 989. The Supreme Court adopted the lower court's holding that the plaintiff "must allege and prove ... that the shares were traded on an efficient market" before a trial court may invoke the presumption. *Id.* at 992 n. 27.

No issues under the Seventh Amendment are presented here because a court can consider factual data presented by the parties which consideration is necessary to determine whether plaintiffs should be allowed to proceed under a judicially created method of satisfying an element of a cause of action. Plaintiffs' Seventh Amendment

arguments (to the effect the court would be usurping the fact finding role of the jury) are something of a red herring because the trial court would not be making factual findings binding on the jury. For example, if it were concluded after a hearing the market appeared efficient, and plaintiffs could proceed under the rebuttable presumption, PMM would be entitled to prove to a jury that the market was inefficient, thereby rebutting the presumption. Furthermore, plaintiffs' counsel reaffirmed at oral argument the Poser Affidavit should be considered in connection with a determination as to the applicability of the fraud on the market presumption. No plausible explanation was given (nor does one exist) why more data—presented either in document or testimonial form—could not be requested by a court to assist in deciding whether to permit the presumption at this stage.[46]

By adopting the fraud on the market theory, the courts have simply created a method of allowing plaintiffs to more easily satisfy the reliance element; the predicate to invocation of the fraud on the market theory, an efficient market, is not a necessary element to a securities fraud suit, as such. The language in *Basic* makes it clear the court, not a jury, is to determine the appropriateness of applying "a rebuttable presumption of reliance." 108 S.Ct. at 989.

Plaintiffs have more persuasively argued, as a matter of judicial economy, there should only be one presentation of factual evidence in this case. A court can await the merits trial and base its determination of the "character of market" upon the same evidence simultaneously considered by the jury in connection with the

---

**44.** As stated in one of their submissions,

[T]o plaintiffs' knowledge, a jury has never been called upon at the preliminary stage of a case to decide whether the fraud on the market presumption applied. In every case where reliance on the rule was alleged in the complaint, before and since *Basic,* the court determined if the presumption applied.

Plaintiffs' Second Brief at 8.

**45.** A presumption is a rule of evidence to be applied by the court. *See* Fed.R.Evid. 301 (describing presumptions in general in civil actions

and proceedings). 9 Wigmore, Evidence § 2487 at 295 (Chadbourn Rev.1981) ("a presumption signifies a ruling of law"). *See* footnote 48.

**46.** Clearly, a district court is entitled to relevant information in order to decide whether to permit the presumption. Plaintiffs do not appear to disagree. They have submitted the Poser Affidavit. *See generally* "Evidentiary Base to Support the Presumption," Plaintiffs' Third Brief, p. 5.

other elements of a Rule 10b–5 litigation. Although PMM has indicated a pretrial evidentiary hearing should last no more than two days, (*see* letter from counsel to PMM, dated December 20, 1988, p. 2), counsel to the plaintiffs, in their opposition to the pretrial hearing, suggest "the trial would require at least two weeks, and quite possibly longer." Plaintiffs' Second Brief, p. 30.[47]

■■■■■ All that is in issue, as discussed above, is whether to apply a rebuttable presumption at this stage. At this stage, PMM would be able to submit at the most an equally credible case at the evidentiary hearing to the effect the market for Coated Sales stock is inefficient, the only point being that reasonable experts can differ on such an abstract issue. Because of the

significant number of objective characteristics contained in the Poser Affidavit, the outcome of a hearing would almost inevitably be to allow the presumption to stand, and to submit the question of efficiency for ultimate determination by the jury.[48]

While there is no present need to pretest the efficiency of the market for Coated Sales stock, it is possible a pretrial hearing on this issue may become appropriate at a later stage. For example, after the facts are developed during discovery in this case, PMM may be able to prove empirically that the market is inefficient. As previously noted, one of the most convincing ways to demonstrate efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price. How-

---

**47.** Although a hearing of this duration may be necessary and appropriate in other cases, such a delay is unwarranted here in light of the substantial content contained in the Poser Affidavit. In addition to making substantial assertions about the character of the market for Coated Sales stock, Mr. Poser, in his affidavit, demonstrates he is qualified to offer an expert opinion on the nature of securities markets. His high level positions at, among other places, the American Stock Exchange (where he was Executive Vice President) provide an adequate foundation for his asserted expertise. *See Fowle v. C & C Cola*, 868 F.2d 59 (3d Cir.1989) (qualifications of expert must be set forth in affidavit opposing motion for summary judgment).

**48.** A threshold question existed as to how much of a factual showing is necessary to demonstrate an efficient market so that a presumption of reliance would be allowed. The Poser Affidavit constitutes a sufficient factual showing at this stage. The notes of the Advisory Committee on 301 of the Federal Rules of Evidence indicate "the burden of establishing the nonexistence of the presumed fact [in this case reliance], once the party invoking the presumption *establishes the basic facts giving rise to it*," will be placed upon PMM. While nothing has been "established" at this point, the Poser Affidavit sufficiently asserts "the basic facts" which would support a presumption of an efficient market.

A secondary question arises whether PMM should be given an opportunity now to successfully contradict the Poser Affidavit, such that it would be concluded the "basic facts" do not exist to give rise to the presumption. As noted in the text, it is anticipated that at an evidentiary hearing PMM would produce an expert with qualifications as impressive as those of Mr. Poser. It is also anticipated PMM's expert would

present a compelling case that the market for Coated Sales is inefficient and Poser would doubtless stand by the data in his affidavit which suggest otherwise. On the issue of the ease with which a party opposing a presumption can resist its application by undercutting the factual predicate, reference is made to the so called "bursting bubble" theory concerning presumptions. This theory, under which a presumption vanishes upon the introduction of evidence which would support a finding of the nonexistence of the presumed fact, has been rejected in many instances because it accords presumptions too "slight and evanescent" an effect. *See Federal Rules of Evidence Manual*, 4th ed., Advisory Committee's Note to R. 301 at 98. Similarly, it would be according such a presumption too slight an effect if, at this preliminary stage, PMM were allowed to eliminate the presumption by contradicting the Poser Affidavit. This is not to suggest, however, that at a later point in this matter, it would be not be possible to demonstrate the absence of facts upon which a presumption of reliance is based.

An analogy also might be drawn to the standards governing opposed versus unopposed motions for summary judgment. When a party moving for summary judgment submits an adequate supporting affidavit which goes unopposed (and the law is in favor of the moving party), summary judgment is usually granted. If, on the other hand, the opposing party submits a contradictory affidavit, factual issue is joined and the case should move forward to the jury. So it is here. Although plaintiffs are not the movants in this motion, the reasoning of "joining issue" in the sense of opposition to a summary judgment motion is applicable in this situation. In this regard, the Poser Affidavit appears far from frivolous in the way it suggests the existence of an efficient market and, accordingly, the presumption should stand at this time.

ever, as mentioned, such a showing (or, in the case of PMM, the absence of it) would be difficult because it would require exploration of materiality and causation issues. In light of the apparent substance of the Poser Affidavit, plaintiffs will not be required to delve into such issues at this early stage.

In cases where no substantial showing of an efficient market has been made, it is important to note that even if the pretrial evidentiary hearing lasted as long as two weeks, such a period is most probably considerably less time than a full trial of all aspects of a significant securities fraud matter. If it were straightforward that Coated Sales did not trade in an efficient market, the trial could be simplified. Plaintiffs' counsel dispute the existence of such potential efficiency in this case, arguing that there are at least some plaintiffs who can establish alternative theories of reliance (i.e., need not rely on the fraud on the market theory) and the auditing issues will have to be explored in any event.[49]

It is recognized that ordering a pretrial hearing would place an unanticipated, indeed unprecedented,[50] obstacle in front of the plaintiffs, and that significant issues may be involved concerning the purposes of the securities laws and of class action litigations. This procedural issue has been addressed by certain commentators:

It is important to have a fairly simple way of resolving—at least tentatively—at an early state in a case whether the market for a particular security is open, developed and efficient, since this affects whether a claim has been stated and

whether a class may be certified. For statement of a claim, the allegations of the complaint are normally sufficient. But their sufficiency for class determination is open to question since the ruling for or against the class in practice often determines the fate of the case. Thus some sort of evidentiary base is appropriate for class determination.[51]

Bromberg, *supra*, at § 8.6. Bromberg noted that "ultimately, one must decide what degree of responsiveness suffices for an efficient market. Expensive experts with complex equations and long computer printouts are highly likely to reach opposite conclusions on efficiency of the market." *Id.* Without citing any cases where the issue had been specifically addressed by a court, Bromberg offered:

We think that, at a minimum, there should be a presumption—probably conditional for class determination—that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System. The presumption would be rebuttable on a showing that the specific security in question is inactively traded on the market or unresponsive to new information. For other markets a presumption is harder to frame. Whether the trier of fact is allowed or required to engage in a presumption, the most practical—and therefore probably the best—base for the presumption is average trading volume over

**49.** It is noted if a company trades in an efficient market, plaintiffs would be relieved of the substantial discovery and proof burdens concerning direct reliance—which could add months of trial preparation to this dispute. See § 21.33 of the MCL 2d ("conducting a separate trial under Fed.R.Civ.P. 42(b) of issues that may render unnecessary or substantially alter the scope of further discovery or trial"). Plaintiffs' apparent disregard for this potential efficiency, which runs in their favor, underscores the assumption referred to above that the vast majority of plaintiffs in this case rely upon the fraud on the market presumption of reliance.

**50.** At least one court has stated it would not follow such a practice. *See Garfinkel v. Memo-*

*ry Metals, Inc.,* 695 F.Supp. 1397, 1403 (D.Conn. 1988) ("[W]hether Memory Metals stock was traded on an efficient market ... go[es] directly to the merits of the case and thus should not be decided at [the class motion]").

**51.** Although plaintiffs have relied on several cases addressing fraud on the market in the class certification context, this litigation is not yet at that stage. At the time of class certification, it *may* be appropriate to revisit the fraud on the market theory. Because of the substantial effort put forth in this motion, it is not anticipated that further extensive briefing on the fraud on the market issue will be necessary.

a period of several months surrounding the time of the alleged violations. Turn-over measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption. For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.

*Id.*

■■ "[I]t is important to have a fairly simple way of resolving ... at an early stage ... whether the market is ... efficient." *Id.* at § 8.6. PMM's arguments that the absence of New York or American stock exchange listing, or the status of a Form S–3 registrant, should *per se* preclude application of the fraud on the market theory were previously rejected. Similarly, a rule which *per se* subjects a party to protracted litigation merely because a company's stock trades within a certain NASDAQ grouping (i.e., the National Market System) is also rejected. Because there appears to be a significant *prima facie* showing by plaintiffs concerning the character of the market in this case, an evidentiary hearing at this time is unnecessary.

### III. *Controlling Persons Doctrine: Control*

Plaintiffs have alleged that Kagan, as a director, assistant secretary and attorney for Coated Sales, was a "controlling person" of the Company, and therefore secondarily liable for the securities fraud allegedly committed by Coated Sales and other defendants. It is also alleged Kagan sold significant amounts of Coated Sales stock immediately prior to the Company's announcement of the alleged financial irregularities. Finally, although perhaps without particularity, the Amended Complaint basically alleges Kagan either know-

ingly or recklessly participated in the dissemination of misleading information about the Company. Amended Complaint ¶ 50. Kagan has moved to dismiss this federal securities law claim on the grounds that plaintiffs have failed to allege sufficient facts indicating that Kagan exercised actual control of the Company's operations.

Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t, provides:

Every person who, directly or indirectly controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*Id.*

■■ The case law is inconsistent on what facts must be alleged in order to survive a defendant's motion to dismiss for failure to assert "controlling person" status. It is clear, however, even if defendant is found to be a "controlling person," no liability will attach if he can make out the good faith statutory defense. *See Harriman v. E.I. Dupont De NeMours and Co.,* 372 F.Supp. 101, 105 (D.Del.1974) ("defendant may demonstrate, by way of defense, that he did not, directly or indirectly induce [the fraudulent] transaction").

The inconsistency in the case law appears to be caused, at least in part, by the fact that some courts separately analyze whether a person is a controlling person and, if so, whether they can establish the good faith defense. Other courts seem to collapse the analysis by focusing immediately on the bottom line: whether a defendant can be held liable as a controlling person, without a reasoned threshold determination of whether he was a controlling person.

The practical effect of these differing approaches is critical to Kagan's motion to dismiss. Courts applying the first approach appear inclined to hold directors to be controlling persons based on status, which would defeat a motion to dismiss,

and then to shift the burden to the defendant to establish his good faith. *See Savino v. E.F. Hutton & Co., Inc.*, 507 F.Supp. 1225, 1242–43 (S.D.N.Y.1981) (discussing the inconsistency in the case law and noting that "[t]oday, however, it is fairly well agreed that proof of 'control by status,' as distinct from 'actual control,' is all that is required to make out a prima facie case under Section 20(a); ... proof of control by status creates a presumption of 'control', which presumption can be rebutted if the alleged controlling person proves and absence of actual control").

Plaintiffs have cited considerable authority for the proposition that, if a defendant is alleged to be a director of a corporation, he is presumptively a controlling person and the burden shifts to him to demonstrate good faith and noninvolvement in the underlying fraud.[52] On the other hand, defendant Kagan has cited impressive authority to the effect that a plaintiff must allege the director exercised some form of actual control over the company, such as day-to-day involvement in the company's affairs.[53]

Neither Kagan nor the plaintiffs have cited to Third Circuit precedent on this question. In addition, it appears the Supreme Court has not resolved this question of control based on status. In resolving this issue, a passage *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880 (3d Cir.1975), is instructive:

Our next inquiry is to the meaning of "control" under Section 20(a). There is no statutory definition of "control"; however, the SEC has defined "control" as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise," 17 C.F.R. Section 240.12(b)–2(f). Congress deliberately did not define "control," thus indicating its desire to have the courts construe the applicable provisions of the statute along with the evidence adduced at trial.

**52.** Relying on a provision similar to section 20(a), the plaintiffs in *In re Storage Technology Corp. Securities Lit.*, 630 F.Supp. 1072, 1079 (D.Col.1986), merely alleged that the defendants were *directors* of the corporation. The court held that plaintiffs properly pleaded the moving defendants as "controlling persons," shifting to them the burden of showing good faith. The court reasoned that "[t]he individual defendants, by virtue of their positions as directors ... clearly possessed the 'power to direct or cause the direction of the management and policies' ... through actions as directors, thus these defendants are *prima facie* controlling persons of [the corporation]." (citing cases) *See also Moerman v. Zipco, Inc.*, 302 F.Supp. 439, 447 (E.D.N.Y.1969) ("the board was not a 'rubber stamp,' and [the defendant directors] actively participated in board meetings. The conclusion is inescapable that persons who act as directors are in control of the corporation. This is especially true in light of the liberal construction of this section as including 'indirect means of discipline or influence short of actual direction' "); *Stern v. American Bankshares Corp.*, 429 F.Supp. 818, 823 (E.D.Wis.1977).

**53.** In *Lanza v. Drexel & Co.*, 479 F.2d 1277 (2d Cir.1973), the Second Circuit, in considering the control requirement of Section 20(a), stated that "[t]he intent of Congress in adding this section ... was obviously to impose liability only on those directors who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated

by controlled persons." *Id.* at 1299. By using the phrase "only on those directors who fall within [the] definition of control," it appears that the *Lanza* court would not embrace a "control by status" approach. *Lanza* did not discuss what it would take to confer control status on a director based only upon his position. *See also Herm v. Stafford*, 663 F.2d 669, 684 (6th Cir. 1981) (in granting a motion for summary judgment, court stated that "[a] director of a corporation is not automatically liable as a controlling person. There must be some showing of actual participation in the corporation's operation or some influence before the consequences of control may be imposed"); *Kimmel v. Labenski*, [1987–1988 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,651 at p. 97, 991, 1988 WL 19229 (S.D.N.Y.1988) (plaintiff required to allege specifically how each director possessed power to direct or cause the direction of the management); *Stoller v. Baldwin United Corp.*, [1984 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 91,678 at p. 99,428 (D.Oh.1984) ("in order to make out a prima facie case of control person liability, the plaintiff must show that the [director] actually participated in or influenced the corporation's regular operations"); *Camrose, Inc. v. The Intervestor U.S. Real Estate Fund*, [1975–1976 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,469 at p. 99,376 (S.D.N.Y.1976) ("it seems clearly established that inactive directors, without more, cannot be controlling persons").

Many factors are involved in determining if one is a "controlling person." In making this determination, the courts have given *heavy consideration to the power or potential power to influence and control the activities of a person, as opposed to the actual exercise thereof.* (emphasis supplied) *Id.* at 890. While the above language suggests that the Third Circuit would endorse a "control by status" approach, it is noted that in *Rochez* the "controlling person" was the chief executive officer and fifty percent owner of the corporation. He "ran the day-to-day business activities and obviously had the power to influence the policies and actions of [the corporation]." *Id.* at 891.

In *Gould v. American–Hawaiian S.S. Co.*, 535 F.2d 761, 779 (3d Cir.1976), the Third Circuit again indicated a defendant could be a "controlling person" under Section 20(a) of the Exchange Act based upon "influence short of actual direction." (citing *Myzel v. Fields*, 386 F.2d 718, 738 (8th Cir.1967)). *See also Harriman v. E.I. Du-Pont De Nemours and Co.*, 372 F.Supp. 101, 105 (D.Del.1974) ("a plaintiff can state a cause of action under Sections 10b–5 and 20(a) of the Exchange Act without alleging any affirmative action on the part of the defendant.... '[S]tatus' may suffice if that status is such that it involves the potential for control").

The plaintiffs have alleged Kagan was a director, assistant secretary and legal counsel of Coated Sales. For its legal services, Kagan's law firm received $326,665 in fees in fiscal 1986. Plaintiffs also allege Kagan signed the Coated Sales reports which contained the alleged misstatements. If these are not sufficient factual allegations under the foregoing authority, the Amended Complaint also alleges the defendants (which, it is assumed, includes Kagan) knowingly or recklessly participated in the fraud.

▮ Kagan specifically attacks the allegation he knowingly or recklessly participated in the fraud as lacking the particularity required under Fed.R.Civ.P. 9(b). While it might be concluded this allegation of knowing or reckless participation might

not meet the pleading standard of the Third Circuit—liberal though it may be—, *see Seville Industrial Machines Corp. v. Southmost Machinery Corp.*, 742 F.2d 786 (3d Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985); *Kronfeld v. First Jersey Nat. Bank*, 638 F.Supp. 1454 (D.N.J.1986), it appears that the specific allegations that Kagan was a director, assistant secretary and attorney for Coated Sales are sufficient to survive a motion to dismiss the Section 20(a) claim. As discussed, however, these boilerplate allegations concerning Kagan's participation in the fraud are not sufficient under *Seville* to survive Kagan's motion to dismiss the state law claims contained in Count II and Count III of the Complaint.

Without necessarily endorsing on a wholesale basis the "control by status" approach to all Section 20(a) cases, pursuant to the applicable standards governing Rule 12(b)(6) motions, Kagan's motion to dismiss the Section 20(a) claim is denied. Coated Sales is a small company and Kagan apparently had considerable holdings in it, until he made his decision to sell in April, 1988. It may be presumed for pleading purposes a director, who was also corporate counsel and assistant secretary, in such a company would have at least some global responsibilities for, and interest in, corporate affairs. Although plaintiffs have not alleged with particularity any specific facts which would seem to tie Kagan to the fraud itself, plaintiffs have met their liberal pleading requirements as to the Section 20(a) claim. To the extent that plaintiffs fail to establish any actual culpability on the part of Kagan, he will of course be entitled to assert his statutory good faith defense.

## IV. *Common Law and Other Claims*
*PMM*

▮ In addition to alleging PMM violated Rule 10b–5 in connection with its certification of Coated Sales' 1987 financial statements, plaintiffs claim PMM is liable under other theories (primarily under state law) for its involvement in both the 1987 and 1988 financial reports. As to the 1988 financial reports, plaintiffs have alleged

PMM was aware of accounting irregularities at Coated Sales just prior to the Company's release of preliminary results for 1988, but that PMM delayed for two weeks before approaching the Board of Directors.[54] As a distinct species of a federal securities law claim, plaintiffs argue PMM's alleged failure to timely notify the Board of Directors of its May 1988 discovery renders PMM "liable as aider and abettor for violating [various accounting professional standards or guidelines]." Complaint ¶ 54. In this Circuit, a party may be held liable as an aider and abettor to a fraud where: (1) there has been a commission of a wrongful act—an underlying securities violation; (2) the alleged aider and abettor had knowledge of the act; and (3) the aider and abettor knowingly and substantially participated in the wrongdoing. *Monsen v. Consol. Dressed Beef Co., Inc.*, 579 F.2d 793, 799 (3d Cir.), *cert. denied*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978). Plaintiffs seek to satisfy the third element of an aiding and abetting claim—knowing and substantial participation in the wrongdoing—by arguing in their brief PMM intended by its inaction in 1988 to avoid both a full-scale inquiry into the 1987 financial audit and the embarrassment of blowing the whistle on a client, which is in fact exactly what PMM did in May, 1988.

Although it has been held that "the 'substantial assistance' element of aider and abettor liability may be satisfied by 'inaction ... where the plaintiff demonstrates that the aider-abettor consciously intended to assist in the perpetration of a wrongful act,'" *Kronfeld, supra,* 638 F.Supp. at 1470, plaintiffs have asserted nothing in the Amended Complaint from which a reasonable inference could be drawn that PMM had "thrown in" with the individual defendants to assist them in the commission of securities fraud. *See Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 497 (7th Cir.1986); *Segal v. Coburn Corp. of America,* [1973] CCH Fed. Sec.L.Rep.] 94,002 at p. 94,021 (E.D.N.Y. 1973), *accord, Jacobson v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 518, 522 (S.D. N.Y.1977); *Weinberger v. Kendrick,* 432 F.Supp. 316, 321 (S.D.N.Y.1977). Plaintiffs may speculate PMM would benefit by remaining silent—to avoid reopening the 1987 audit—but nothing has been alleged which reasonably suggests PMM stood to gain from the commission of the accounting fraud itself (the act with respect to which there must be "knowing and substantial participation").[55] Moreover, it is not clear how delaying two weeks eliminated the potential need (if it ever existed) to revisit the 1987 audit.

**54.** To the extent plaintiffs look to Rule 10b–5 as a basis for holding PMM liable on the 1988 unaudited financial statements, these claims are dismissed. Because PMM did not certify these financial statements, its two week delay in approaching the Coated Sales Board of Directors does not constitute a breach of duty to disclose under federal securities laws. *LHLC Corp. v. Cluett, Peabody & Co.,* 842 F.2d 928 (7th Cir. 1988); *Robin v. Doctors Officenters Corporation,* 686 F.Supp. 199, 208 (N.D.Ill.1988); *In re A.M. International Inc. Securities Litigation,* 606 F.Supp. 600 (S.D.N.Y.1985).

**55.** As to the allegations in the Amended Complaint (or the lack of them), PMM argues all claims concerning Coated Sales 1987 financial statements should be dismissed pursuant to Fed. R.Civ.P. 9(b), with leave given to replead with particularity. The pleading standards for fraud in the Third Circuit are set forth below in connection with the fraud allegations against Kagan. As to PMM, the primary claim based upon the 1987 financial statements is asserted under Rule 10b–5 for misstatements in the financials. Quite apart from the liberal pleading standard,

*Seville, supra,* it is concluded the Amended Complaint is sufficiently specific. It asserts the primary misrepresentations are contained in the revenue accounts (as a result of the "bill and hold" accounting treatment). PMM has been made fully cognizant of the alleged basis for this claim.

As to other claims based upon the 1987 financial statements, two observations are made. First, certain of the claims which might require more specificity should be dismissed on other grounds as a matter of law, thus rendering unnecessary consideration of the request for more particularity (*see* discussion of Count III, *infra* ). Second, certain claims may indeed require more specificity. As discussed below, to succeed on Count II of the Amended Complaint (common law fraud and deceit), it will be necessary for individual plaintiffs to demonstrate direct reliance. To this extent, PMM is correct that specificity is lacking. Plaintiffs have been granted leave to further amend the Amended Complaint to assert individual reliance.

In *Merkel v. Livestock Breeders International of New Jersey*, No. 86–4003, 1988 WL 66864, 1988 U.S. Dist. LEXIS 5772 at 11 (D.N.J. June 21, 1988) the court dismissed plaintiffs' Section 10(b) claim, holding:

"'an accounting firm has no duty to disclose fraudulent conduct and may not be judged as an aider and abettor under Section 10(b) where it has not given some representation or certification, such as an opinion or certified statement, or has not invited the public to rely on the firm's financial judgment at the time.'"

*See also Chase Manhattan Bank, N.A. v. Fidata Corporation*, 700 F.Supp. 1252, 1253 (S.D.N.Y.1988):

"The securities laws do not require every participant in the commercial marketplace to become a whistleblower. The courts have held that an accountant cannot be held liable on the basis of its business relations with any primary wrongdoer where there is no evidence that the accountant took any actions to defraud."

*Id.* at 1263. Plaintiffs' aiding and abetting claim against PMM is dismissed.

■ If the federal securities law claims were dismissed in all respects, for failure to demonstrate an efficient market in Coated Sales stock, plaintiffs' state law claims would be dismissed as well. The assertion of pendent jurisdiction is without merit if plaintiffs' purported federal claims are dismissed. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct.

1130, 1139, 16 L.Ed.2d 218 (1966). Without diversity, there exists no separate basis for jurisdiction to hear the state law claims. To the extent plaintiffs have survived PMM's current motion to dismiss the Rule 10b–5 claim, however, it becomes necessary to consider PMM's other arguments for dismissing plaintiffs' common law claims.

■ The facts concerning reliance in this case, which are subject to repleading, are far from straightforward. As indicated below, however, they are critical to many aspects of the state law claims. It has been discussed at length that individual reliance has been an elusive concept so far in this litigation. The validity of certain of the state law claims depends, moreover, upon the existence of direct reliance by individual plaintiffs. It is anticipated the plaintiffs will further amend the Amended Complaint to allege some plaintiffs directly relied on the PMM financial reports, some plaintiffs indirectly relied on the PMM financial reports, some plaintiffs relied solely on the "efficiency of the market" to reflect the content of the PMM reports, and some plaintiffs can demonstrate aspects of all or some of these forms of reliance. It is against this backdrop that plaintiffs' state law claims must be reviewed.

Plaintiffs have alleged in Count II of the Amended Complaint that PMM is liable for common law fraud and deceit. In order to state a cause of action for common law fraud and deceit against PMM it is well settled in this Circuit that no judicial presumption of reliance [56] may be interposed

---

**56.** It was suggested at the Hearing by plaintiffs' counsel that the exception to the reliance requirement articulated in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–154, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972) could be looked to as satisfying the direct reliance requirement applicable under state law. *Affiliated Ute* permits a presumption of reliance (like fraud on the market) where the fraud is perpetrated by committing omissions (which would be difficult to prove actual reliance on) rather than misrepresentations. Plaintiffs' argument, which has no apparent support in the case law, is rejected for two reasons. First, although the cases holding state law causes of action require direct reliance primarily addressed the fraud on the market as the proposed substitute, the notion that the result should somehow be different with an alternative judi-

cial substitute for reliance (the "omissions" exception) is unpersuasive.

Second, it does not appear this is an omissions case in any event. The gravamen of the Amended Complaint, as it concerns PMM, is that PMM overstated the financial performance of Coated Sales; the dollar amounts in certain line items of the financials were wrong. In the 1987 financial statements, for example, revenues were allegedly misrepresented as a result of the "bill and hold" transactions. If investors read the PMM report it is plaintiffs' basic theory that they would have been misled into believing the Company had certain revenue earning capacity. To allow the nature of this claim to be characterized as an omission both defies logic and would obliterate the well-crafted distinction between misrepresentation cases and omissions

on pendent state law claims. As stated by the Court of Appeals in *Peil v. Speiser*, 806 F.2d 1154 (3d Cir.1986):

> While the fraud on the market theory is good law with respect to the Securities Acts, no state courts have adopted the theory, and thus *direct reliance* remains a requirement of a common law securities fraud claim.... The district court was therefore correct to direct a verdict against [plaintiff] on the common law claims. (emphasis added).

*Id.* at 1163 n. 7. *Accord, In re ORFA Securities Litigation*, 654 F.Supp. 1449, 1460 (D.N.J.1987) ("There does not appear to be any common law exceptions to the requirement of individual reliance (analogous to the judicially created Rule 10b–5 exceptions) [sic]"); *Gruber v. Price Waterhouse*, 117 F.R.D. 75, 81 (E.D.Pa.1987) ("It is clear that a plaintiff in a common law securities fraud case must prove direct reliance. A fraud-on-the-market theory is not available"). Count II of the Amended Complaint accordingly is dismissed (as it relates to PMM) with prejudice as to all plaintiffs who cannot allege they directly relied upon the PMM audit report. Leave to amend to assert such reliance has been granted.

 Plaintiffs claim in Count III of the Amended Complaint that PMM is liable to them for negligent misrepresentations contained in Coated Sales financial statement. Of course, plaintiffs can only be talking about the 1987 financial statements; PMM resigned and made no representations as to the Fiscal 1988 reports. The plaintiffs' claim of negligent misrepresentation must be dismissed as to all plaintiffs who do not fit within a narrow category of investors. As the Supreme Court of New Jersey held in *Rosenblum v. Adler*, 93 N.J. 324, 461 A.2d 138 (1983):

> The principle that we have adopted applies by its terms only to those foreseeable users who receive the audited statements from the business entity for a proper business purpose to influence a business decision of the user, the audit having been made for that business entity. Thus, for example, an institutional investor or portfolio manager who does not obtain audited statements from the company would not come within the stated principle. *Nor would stockholders who purchased the stock after a negligence audit be covered in the absence of demonstrating the necessary conditions precedent.* (emphasis added).

*Id.* at 352–53, 461 A.2d 138. It is not completely clear from the language in *Rosenblum* to what extent individual plaintiffs in this case have a negligence cause of action against PMM. PMM argues no case, including *Rosenblum*, has ever created a negligence cause of action for the investing public generally. PMM's First Brief, p. 26. PMM relies primarily on cases from other jurisdictions, primarily *Biben v. Card*, No. 84–0844–CV–W–6 (W.D. Mo.1985) ("the liability of auditors and accountants for negligence or negligent misrepresentation does not extent ... to the general investing public").

While the language in *Rosenblum*, the only New Jersey case cited by the parties on this point, appears to afford a negligence cause of action to certain "foreseeable users" which rely on an accountants' audit report, the class of plaintiffs seems to be very narrowly circumscribed. *Rosenblum* refers to people who use the audit to influence a business decision. Furthermore, potential plaintiffs must "obtain audited statements from the company."

The argument might be made by plaintiffs that their decision to invest was a "business decision," and that the audit was performed for them in the sense that accountants' audit reports are prepared, and filed under the Exchange Act, with the purpose of, among other things, keeping investors informed. To conclude on that basis alone there is a negligence cause of

---

cases. Apparently, plaintiffs argue PMM "omitted" to disclose the Company was misreporting revenues. Quite apart from the fact that such a disclosure would be absurd (because the professional solution would be to restate the erroneous revenue figures), PMM did in fact set forth a footnote to the financial statements explaining Coated Sales' revenue recognition practices. *See* footnote 7.

action for the investing public generally, however, would be a liberal reading of *Rosenblum.* If that was the holding in *Rosenblum,* it could have been more clearly stated. Count III of the Amended Complaint must be dismissed as to all plaintiffs who cannot prove they received the PMM report *"from* the Company" for the purpose of making a business decision.[57] Even if individual plaintiffs can establish their investments were made along the lines suggested above, *Rosenblum* made it clear throughout the decision that plaintiffs can only recover against an accountant for negligent misrepresentation if they "do in fact place reliance on the [accountant's] audit to their detriment." *Id.* at 341, 461 A.2d 138. As discussed above, plaintiffs herein have not adequately pled reliance on any reports issued by PMM. The judicially-created presumption of reliance does not apply to common law claims of negligent misrepresentation. *See Snider v. Upjohn Co.,* 115 F.R.D. 536, 541–42 (E.D.Pa.1987) (dismissing class action claims of state law negligent misrepresentation). Accordingly, Count III is further dismissed as to all plaintiffs who cannot demonstrate individual reliance.

*Kagan*

 In addition to the derivative liability asserted under Section 20(a), plaintiffs also allege Kagan is liable under SEC Rule 10b–5 as an aider and abettor. Kagan contends that no fraud on his part has been stated with the requisite particularity, and that this claim should be dismissed. In a securities fraud action, the burden is on the plaintiff to

allege *facts* indicating an intent to deceive, manipulate, or defraud, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 192 n. 7, 96 S.Ct. 1375, 1380 n. 7, 47 L.Ed.2d 668 (1976), and Rule 9(b) requires that the circumstances constituting such fraud be stated with particularity.

*Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111 at 115 (2nd Cir.1982) (emphasis supplied).

Plaintiffs correctly point out that the courts have moved toward a more lenient application of Rule 9(b). *Kronfeld v. First Jersey Nat. Bank,* 638 F.Supp. 1454, 1463 (D.N.J.1986). Allegations of "date, place or time" of the alleged deception fulfill 9(b)'s requirements, but are not required as "plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *See Seville Industrial Machines Corp. v. Southmost Machinery Corp.,* 742 F.2d 786 (3d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985).

Having stated the liberal standard, however, plaintiffs fail in the Amended Complaint to inject *any* "form of precision or measure of substantiation" to their allegations of fraud on the part of Kagan. As discussed above, aiding and abetting requires knowing participation on the part of the defendant. All that plaintiffs allege is that Kagan was a director and outside attorney for the Company and that he sold certain amounts of Coated Sales stock during the Class Period. As to any direct knowledge of the fictitious "bill and hold" transactions or the phony machinery deposit, the Amended Complaint merely sets

---

**57.** In *Rosenblum,* the investors referred to by the court were institutional investors and portfolio managers. It is conceivable how a company would provide a special copy of an audit report to large "foreseeable users" to induce significant investment in the company. Other examples of where companies issue specific audit reports to entities, to induce a business decision, include when companies perform a special audit to induce a bank to extend a loan, or a supplier to sell on credit. *Id.* at 345, 461 A.2d 138. The few cases which have cited *Rosenblum* for this proposition did not involve plaintiffs who were merely members of the investing

public generally. *See, e.g., Toro Company v. Krouse, Kern & Company,* 827 F.2d 155 (7th Cir.1987) (court addressed whether accounting firm was liable in negligence to credit company); *Matter of Oliver's Stores, Inc.,* 79 B.R. 588 (Bkrtcy.D.N.J.1987) (creditors committee proceeding against accounting firm for negligence). It is concluded that, based upon the apparent concern in *Rosenblum* that the class of plaintiffs be narrowly defined, the term "business decision" means something over and above ordinary "investment decision"—a common term the court could have but choose not to use.

forth a broad conclusory allegation.[58] Quite apart from the issue of whether plaintiffs had *Kagan* in mind when they drafted paragraph 50—which is presumed under the rule of liberal construction—there is no *particularity* demonstrating Kagan either knowingly or recklessly participated in the fraud. There are no allegations, for example, that Kagan, as part of his duties as a director, was on the audit committee of the Board of Directors. There are no allegations that he exercised any responsibility for the Company's day to day operations.[59] Indeed nothing at all is alleged in the Amended Complaint from which it can be inferred that Kagan knew of or participated in the fraud.

There is really no way for Kagan to answer the Amended Complaint other than to admit he is a director but deny that he conspired with Coated Sales executives to defraud the shareholders. Even if Kagan is able to answer the boilerplate allegations in this way, Rule 9(b) has the additional important purpose of requiring specific allegations to "demonstrate plaintiffs have investigated the alleged fraud and reasonably believe a wrong has occurred." *Kronfeld, supra,* 638 F.Supp. at 1463.

■■■ Rule 9(b) may not require a plaintiff to identify specific documents that a director read or business meetings which he attended. In order to demonstrate the alleged fraud was duly investigated, however, some specific facts must be alleged. There is no authority which supports a presumption that Kagan, an outside director, was intimately acquainted with Coated Sales' accounting practices. Certified public accounting firms fulfill the role of independent evaluator of the adequacy and fairness of financial statements issued by management to stockholders, creditors,

and others. Broad, "The Progress of Auditing," 100 *J. Accountancy* 38, 38–39 (1955); Hallett & Collins, "Auditors' Responsibility for Misrepresentation," 44 *Wash.L.Rev.* 139, 178 (1968). While it is possible that a director may serve as a liaison between the company and its auditors, or may otherwise be in a position to oversee the revenue recognition and asset capitalization accounting procedures, these are things which must reasonably be alleged.

Plaintiffs' allegations Kagan sold shares of Coated Sales stock do not alone support a claim of aiding and abetting. For the foregoing reasons, plaintiffs' claim of common law fraud against Kagan is dismissed at this time, although plaintiffs are granted leave to replead with particularity any facts which would suggest Kagan had knowledge of, or involvement in, the accounting and reporting practices at Coated Sales. *Clinton Hudson & Sons v. Lehigh Valley Coop. Farms, Inc.,* 73 F.R.D. 420 (D.C.Pa.), *aff'd,* 586 F.2d 834 (3d Cir.1978) ("whether the action be under federal, state or even common law, any allegation of fraud must be plead with the requisite specificity according to the dictates of Fed. R.Civ.P. Rule 9(b) and efforts to characterize the activity as fraudulent, conspiratorial and deceitful simply do not suffice").

■■■ Finally, the Amended Complaint contains a claim of common law negligence against Kagan. Kagan argues the common law negligence cause of action must be dismissed because of an amendment to the Coated Sales, Inc. Certificate of Incorporation, which provides:

> TENTH: The Corporation's directors and officers shall not be personally liable, except to the extent herein provided to the corporation or its shareholders for

---

**58.** Paragraph 50 of the Amended Complaint, without any particular focus on Kagan (either in this paragraph or in surrounding paragraphs), alleges:

> During the Class Period, all defendants, pursuant to said plan, scheme and unlawful conspiracy and course of conduct, knowingly and recklessly issued, caused to be issued, participated in the issuance of, or aided and abetted the preparation and issuance of, false and misleading statements to the investing public,

which were contained in the Annual Report and Form 10–K for the year ended February 28, 1987....

**59.** Although it is not necessary in the Third Circuit for a director to exercise day-to-day control of the business to be a "controlling person" under Section 20(a), the *exercise* of such power would be relevant to a director's knowledge concerning company practices.

damages for breach of any duty owed to the corporation or its shareholders, except that the corporation's directors and officers will not be relieved from liability for any breach of duty based upon an act or omission (a) in breach of such person's duty of loyalty to the corporation or its shareholders, (b) not in good faith or involving a knowing violation of law or (c) resulting in receipt by such of an improper personal benefit.

Plaintiffs counterargue that, by the very terms of the amendment, Kagan is not relieved of liability for the acts specified in (a), (b) and (c). In the same way that plaintiffs have failed to allege basic facts necessary to support their claims of aiding and abetting and of common law fraud, they have failed to allege facts from which it can be inferred Kagan violated the above terms of the charter amendment. The negligence claim against Kagan is accordingly dismissed, with leave granted to further amend the Amended Complaint.

SO ORDERED.